AVCO FINANCIAL SERVICES CONSUMER DISCOUNT COMPANY ONE, INC., PLAINTIFF-APPELLANT, v. DIRECTOR, DIVISION OF TAXATION, DEFENDANT-RESPONDENT.

Argued January 7, 1985—Decided June 26, 1985.

28

*Alvin Weiss* argued the cause for appellant (*Riker, Danzig, Scherer & Hyland,* attorneys; *Wendy C. Hart* on the briefs).

*Martin L. Wheelwright,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

This appeal presents issues similar to those resolved in *Silent Hoist & Crane Co. v. Director, Div. of Taxation,* 100 *N.J.* 1 (1985), also decided today.

In this case, a Pennsylvania financial services company, linked through its national parent with New Jersey affiliated offices, protests the payment to New Jersey of a corporate income tax upon an apportioned share of the interest and service income it received from New Jersey borrowers. The amounts at stake are modest—$1308 for 1974 and $2123 for 1975, in comparison to the $150,000 in revenues derived from doing business in New Jersey during each of those years—but the issues are important. We agree with the Director of the Division of Taxation and the Appellate Division that the taxpayer had the "minimal connection" with New Jersey sufficient to sustain a tax that bears a "rational relationship between the

income attributed to the State and the intrastate values of the enterprise." *Silent Hoist & Crane, supra,* 100 *N.J.* at 8 (quoting *Mobil Oil Corp. v. Commissioner of Taxes,* 445 *U.S.* 425, 436–37, 100 *S.Ct.* 1223, 1231–32, 63 *L.Ed.*2d 510, 520 (1980)).

■ The differing considerations in this case are that (1) we do not deal with a contention by the Division that the taxpayer's income can be reached as part of a "unitary business," and (2) the tax involved is a corporate income tax rather than a corporate franchise tax. As we have seen, since *Complete Auto Transit, Inc. v. Brady,* 430 *U.S.* 274, 97 *S.Ct.* 1076, 51 *L.Ed.*2d 326 (1977), the constitutional analysis of state taxation of interstate commerce depends not on the label given the tax but on the economic effects of the tax. There being no charge that the tax discriminates against interstate commerce, analysis will focus again on the nexus or minimal connection of the activity taxed to the State, and the rational relationship of the fairly apportioned tax to the services provided by the State.

I.

*The State Tax*

The Corporation Income Tax Act (*N.J.S.A.* 54:10E–1 to –24), commonly referred to as a second tier tax (*L.*1973, *c.* 170), imposes a direct corporate income tax (CIT) on corporations deriving income from sources within this state that are not subject to the tax imposed under the Corporation Business Tax Act (*N.J.S.A.* 54:10A–1 to –40). The new levy, approved June 7, 1973, is applicable to calendar and fiscal years ending after December 31, 1973. The current rate of tax is 7¼% of entire net income or such portion as is allocable to New Jersey. *N.J.S.A.* 54:10E–5.

To understand the tax, we must recall the history of state taxation of interstate commerce. Prior to 1973, New Jersey had only a franchise tax although one of its components of

value was measured by income. *See Silent Hoist, supra,* 100 *N.J.* at 11–12. Until *Complete Auto Transit,* it was thought that a direct tax on an exclusively interstate business, phrased solely in terms of a levy on the privilege of doing business in the state, was constitutionally forbidden. To meet this constitutional objection and to reach broader sources of revenue, the *Report of the New Jersey Tax Policy Committee,* Part V, "Non-Property Taxes in a Fair and Equitable Tax System," (February 23, 1972) (Cahill Commission) recommended that New Jersey do as many other states had done, "by adding to their corporate franchise taxes, or by substituting for them, an income tax levied, not on the privilege, or the doing of business in the State, but on income derived from sources within the State." *Id.* at 20.

The Committee recommended that New Jersey retain the corporate business franchise tax (CBT) for corporations to which it can be applied, and adopt this "second-tier net income tax" in recognition of the fact that "there is a good deal of room for broadening the scope" of the State's tax base. *Id.* at 22. The Committee recognized the recent restraints that Congress had placed on state taxing powers under *Pub.L. No.* 86–272, but, relying on *Clairol v. Kingsley,* 57 *N.J.* 199 (1970), decided that there was still a considerable range of exclusively interstate business within the reach of a direct income tax. Cahill Commission, *supra,* at 22. The Committee concluded: "[E]quity demands business carrying on activities in the State and exploiting the New Jersey market make some contribution to the costs of maintaining governmental operations and the services provided by the State * * *." *Id.*

Like the CBT, the CIT is a tax on the corporation's "entire net income," measured in the first instance by its federal taxable income. *See N.J.S.A.* 54:10E–4. That "entire net income" is apportioned to New Jersey by the application of the three-part formula based on receipts, property and payroll within and without the State. *N.J.S.A.* 54:10E–6. To this

allocated income is applied the tax rate of 7¼%. *N.J.S.A.* 54:10E–5.

In connection with the Corporation Income Tax Act, the Legislature passed the Corporation Business Activities Reporting Act, *N.J.S.A.* 14A:13–14 to –23. That act's purpose

> is to enable the Division of Taxation to obtain pertinent data from any foreign corporation which carries on an activity or owns or maintains property in this State but which has not obtained a certificate of authority to do business in New Jersey, to the end that a proper determination may be made as to whether such corporation is subject to any State tax.
>
> [*Associates Consumer Discount Co. v. Bozzarello*, 149 *N.J.Super.* 358, 362 (App.Div.1977).]

*See also American Bank & Trust Co. of Pennsylvania v. Lott*, 99 *N.J.* 32 (1985) (*N.J.S.A.* 14A:13–20, requiring all foreign corporations to file a Notice of Business Activities Report, was not intended to apply to foreign banks).

*N.J.S.A.* 14A:13–15 requires a foreign corporation that, among other things, receives payments from persons residing in this state, or businesses located in this state, aggregating more than $25,000 (as plaintiff did here), to file a Notice of Business Activities Report. The Legislature viewed the receipt of such payments as at least a preliminary indication that a foreign corporation derived income from sources within New Jersey and was subject to the corporation income tax. By filing its report, Avco became subject to the Division's scrutiny.

## II.

### *The Taxpayer and its Activities*

The taxpayer, Avco Financial Services Consumer Discount Company One, Inc. (Avco Pa.), is one of many subsidiaries of Avco Financial Services, Inc. (Avco) linked through Avco Financial Services Management Company (the Management Company) with over 900 branch offices nationwide. Avco Pa. is a Pennsylvania corporation. Among its branch offices are several on the New Jersey border, including Philadelphia, Levittown, Morrisville, and Easton. New Jersey residents have taken out

consumer loans or purchased credit life, accident and health and credit property insurance through the Pennsylvania offices. Avco Pa. also purchased installment contracts from a New Jersey retailer. Avco, through its affiliates, also operates and maintains similar branch offices in New Jersey. The record does not disclose whether the borrower would have any conscious understanding that the Pennsylvania and New Jersey branch offices were of different subsidiaries since Avco has a policy that permits payments to be made on the loans made by the Pennsylvania branches at the New Jersey branches. The loan agreement is between a New Jersey borrower and Avco Pa. "and/or its Parent, Affiliates or Subsidiaries." A sample promissory note in the stipulated exhibits was made payable to Avco Financial Services, Inc. [the parent], "and/or * * * its affiliates or subsidiaries." Mailings from the parent or the management company to existing New Jersey customers invited the customer to refinance or extend existing credit lines. The mailings are warm and encourage the reader to resolve gift, tax and vacation problems, referring in generic terms to "Avco Financial Services," the lender that "believes in you." In addition, the Management Company also provides general radio advertising in New Jersey for the benefit of the parent and its affiliates.

Avco Pa. sends its own personnel into New Jersey to service accounts. Some customers were afforded "once or twice monthly visits" to remind borrowers of their obligations. Avco Pa. estimates that its branch managers spend "three to five percent" of their working hours in New Jersey. When loans are in default, Avco Pa. uses the New Jersey court system to enforce collections (about $3,000 per year), including wage garnishment and repossession of a few New Jersey automobiles. As a result of these activities, Avco Pa. estimates that its interest and other income for each of the years 1974 and 1975 was approximately $150,000.

Pursuant to *N.J.S.A.* 14A:13–15, Avco Pa. filed a Notice of Business Activities Report with the defendant, Director, Divi-

sion of Taxation ("Director"), for the taxable year beginning December 1, 1973 and ending November 30, 1974.[1] Avco Pa. reported that it received payments during the period from "persons residing in or business located in New Jersey" in excess of $25,000. Avco Pa. indicated that such payments were received in respect of notes held by its out-of-state offices. Avco Pa. disclaimed liability under the CIT in its report.

The Director asserted that Avco Pa. was liable for corporate income taxes with respect to Avco Pa.'s receipt of income from "sources within this state." Eventually, Avco Pa. filed tax returns pursuant to the CIT for the taxable years ending November 30, 1974 and November 30, 1975. Each of these returns indicated that Avco Pa. derived no income from sources within New Jersey. Avco Pa. thereafter submitted an estimate to the Director that Avco Pa. received $150,000 in interest income from New Jersey resident borrowers for each of the taxable years in controversy.

The Director issued a final tax deficiency assessment against Avco Pa. with respect to each of the taxable years in question. Based upon Avco Pa.'s estimates regarding receipts from New Jersey residents, the Director assessed taxes of $1308.99 plus interest for 1974 and $2,123.46 plus interest for 1975.

On Avco Pa.'s appeal, the Tax Court ruled that the Director's imposition of the Income Tax Act in this matter violates both the Due Process Clause and the Commerce Clause of the United States Constitution, and granted Avco Pa.'s refund claim. 4 *N.J.Tax* 349 (1982). The Appellate Division reversed the Tax Court finding that there was

> a rational relationship between plaintiff's income attributed to New Jersey and the benefits conferred by New Jersey to justify the imposition of the tax levied here. The internal regulation of the credit market which enables plaintiff's parent to accept payments and process loans; the administration of the Retail

---

[1]Although the taxable year of Avco Pa. commenced in December 1973, the Income Tax Act only taxes income received after its January 1, 1974 effective date. *N.J.S.A.* 54:10E-2.

Installment Sales Act which regulates the issuance and transfer of the install-
ment paper that plaintiff buys from Dean's Appliance; the maintenance of the
courts and the general regulation of collection processes that permit plaintiff to
realize on loans which are in default, are all elements of such a foundation.
[193 *N.J.Super.* 503, 512 (1984).]

We granted the taxpayer's petition for certification. 97 *N.J.*
624 (1984).

### III.

### A.

### *Does the Statute Apply to Income from Intangibles Without a Situs in New Jersey?*

■ The taxpayer has contended that it earned no income in
New Jersey and is therefore not subject to the tax. It contends
that its loans, promissory notes and the interest and proceeds
thereon are all intangible personal property and that the taxa-
ble situs of such an intangible is the domicile of the creditor.
This is the sort of theoretical distinction that has historically
encumbered analysis of state taxation. The underpinning of
the argument rests on the maxim *mobilia sequuntur person-
am* (movables follow the person). Like other maxims, this has
been questioned for "stat[ing] a rule without disclosing the
reasons for it." *Mobil, supra,* 445 *U.S.* at 445, 100 *S.Ct.* at
1235, 63 *L.Ed.*2d at 526 (quoting *First Bank Stock Corp. v.
Minnesota,* 301 *U.S.* 234, 241, 57 *S.Ct.* 677, 680, 81 *L.Ed.* 1061,
1065 (1937)). The Court equated the taxation of income from
intangibles, not with *situs,* but with the relation the income
bears "to benefits and privileges conferred by several States."
*Mobil, supra,* 445 *U.S.* at 446, 100 *S.Ct.* at 1236, 63 *L.Ed.*2d at
526. We believe that the CIT is related to benefits conferred
by the State. It is direct in its reach, speaking, with certain
exceptions, of a tax on income "derived from sources" in New
Jersey. *N.J.S.A.* 54:10E-2. Putting aside traditional concepts
relating to intangibles, the real source of Avco Pa.'s income is
not a piece of paper, but New Jersey borrowers. In *Chemical
Realty Corp. v. Taxation Div. Director,* 5 *N.J.Tax* 581, 593-94

(1983), the Tax Court reviewed the history of the CIT and concluded that the Legislature's intent was not to restrict the taxation of intangibles to the place of commercial domicile. In that case, the subsidiary of a New York bank contested application of the CIT to income it derived from real estate financing activities in New Jersey. In the absence of a legislative intent that the *mobilia* maxim be construed as part of the CIT, interest income received from New Jersey borrowers is "derived from sources within New Jersey" under the act, and thus is subject to the constitutional reach of the State. *Chemical Realty Corp., supra,* 5 *N.J.Tax* at 605;[2] *see also CIT Fin. Services, etc. v. Director, Div. of Taxation,* 4 *N.J.Tax* 568, 578 (1982) (surrogate activities of New Jersey affiliates sustain conclusion that a Pennsylvania lender's interest income from New Jersey residents is amenable to New Jersey taxation).

### B.

### *Is There a Minimal Connection?*

We agree with the Director and the Appellate Division that a sufficient showing has been made to satisfy this requirement. Concededly, there is no litmus test that will resolve the issue for all cases. We can best look to available precedent.

The taxpayer relies primarily on *National Bellas Hess Inc. v. Illinois Rev. Dep't,* 386 *U.S.* 753, 87 *S.Ct.* 1389, 18 *L.Ed.* 2d 505 (1967), and *Miller Bros. Co. v. Maryland,* 347 *U.S.* 340, 74 *S.Ct.* 535, 98 *L.Ed.* 744 (1954). Both of those cases, involving sales taxes, were seen as involving "the almost total lack of contacts" between the seller and the state of delivery. *National Geographic Soc. v. California Bd. of Equalization,* 430 *U.S.* 551, 559, 97 *S.Ct.* 1386, 1391, 51 *L.Ed.*2d 631, 639 (1977). But where there is "some definite link, some minimum connection, between [the State and] the *person* * * * it seeks to tax,"

---

[2]In *Chemical,* the Court found an insufficient level of minimal connection to satisfy due process.

the nexus will be met. *Id.* at 561, 97 *S.Ct.* at 1393, 51 *L.Ed.*2d at 640 (quoting *Miller Bros., supra,* 347 *U.S.* at 344–45, 74 *S.Ct.* at 538–39, 98 *L.Ed.* at 748). Thus, in *Scripto, Inc. v. Carson,* 362 *U.S.* 207, 80 *S.Ct.* 619, 4 *L.Ed.*2d 660 (1960), local solicitation by commission salesmen sufficed to provide the nexus.

■■ In terms of constitutional analysis, the question turns on how the taxpayer has come into the state to work the market. We think here, at a minimum, that:

(1) the presence of Avco Pa.'s employees in the State to collect their overdue accounts evidenced a vigorous, systematic and persistent effort, aided by a substantial physical presence, to exploit the New Jersey market. *See Clairol, Inc. v. Kingsley,* 109 *N.J.Super.* 22 (App.Div.), aff'd, 57 *N.J.* 199 (1970), dismissed for want of a substantial federal question, 402 *U.S.* 902, 91 *S.Ct.* 1377, 28 *L.Ed.*2d 643 (1971); *Tuition Plan of New Hampshire v. Taxation Div. Director,* 4 *N.J.Tax* 470 (1982);

(2) the use by the taxpayer of its affiliate offices in New Jersey to receive payments "made possible the realization and continuance of valuable contractual relations" between Avco Pa. and its New Jersey borrowers. *Standard Pressed Steel Co. v. Washington Dep't of Revenue,* 419 *U.S.* 560, 562, 95 *S.Ct.* 706, 708, 42 *L.Ed.*2d 719, 722 (1975); and

(3) the ongoing use of New Jersey's courts and process to enforce its obligations demonstrates that the taxpayer's activities enjoyed the protection and services for which the State is entitled to something in return. *See National Geographic, supra,* 430 *U.S.* at 561, 97 *S.Ct.* at 1392, 51 *L.Ed.*2d at 640.[3]

---

[3]Of course, we recognize that activities reasonably related to the foreclosure of a mortgage on New Jersey realty do not subject a foreign bank to the New Jersey Corporation Business Tax Act because of such activities. *American Bank & Trust Co. v. Lott,* 99 *N.J.* 32, 36 (citing *Op.Atty.Gen.* No. 5 (April 18, 1961) at 110). But when a foreign corporation "has access to [state] courts to

■ The taxpayer chooses to emphasize, as does the dissent, that the taxpayer does not maintain an office in New Jersey, nor own or lease property here, or have resident representatives. Had any of those factors been present, it would be paying the higher rates due under the Corporation Business Tax Act " * * * for the privilege of having or exercising its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State." *N.J.S.A.* 54:10A–2.

It is precisely the absence of these factors that requires us to explore the constitutional reach of the CIT, for their absence has not always been dispositive of the issue.

> The requisite nexus was held to be shown when the out-of-state sales were arranged by the seller's local agents working in the taxing State, Felt & Tarrant Co. v. Gallagher, 306 U.S. 62, 59 S.Ct. 376, 83 L.Ed. 488 (1939); General Trading Co. v. Tax Comm'n, 322 U.S. 335, 64 S.Ct. 1028, 88 L.Ed. 1309 (1944), and in cases of maintenance in the State of local retail store outlets by out-of-state mail-order sellers. Nelson v. Sears, Roebuck & Co., supra [312 *U.S.* 359, 61 *S.Ct.* 586, 85 *L.Ed.* 888 (1941)]; Nelson v. Montgomery Ward, 312 U.S. 373, 61 S.Ct. 593, 85 L.Ed. 897 (1941). In Scripto, Inc. v. Carson, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960), the necessary basis was found in the case of a Georgia-based company that had "10 wholesalers, jobbers, or 'salesman' conducting continuous local solicitation in Florida and forwarding the resulting orders from that State to Atlanta for shipment of the ordered goods," id., at 211, 80 S.Ct. 619, 4 L.Ed.2d 660, *although maintaining no office or place of business in Florida, and having no property or regular full-time employees there.*
>
> [*National Geographic, supra,* 430 *U.S.* at 556–57, 97 *S.Ct.* at 1390, 51 *L.Ed.* 2d at 637 (emphasis added).]

---

enforce any rights growing out of its transactions" in the state, that access may be considered as part of the minimal contacts sustaining the state's jurisdiction over the foreign corporation. *Carl F.W. Borgward G.M.B.H. v. Superior Court,* 51 *Cal.*2d 72, 78, 330 *P.*2d 789, 793 (1958); *see also Pope v. National Aero Finance Co.,* 220 *Cal.App.*2d 709, 33 *Cal.Rptr.* 889 (1963) (systematic financing program enhanced by physical entrance to repossess aircraft and resort to aid of state courts demonstrate minimum contacts with state); *Staley v. Homeland, Inc.,* 368 *F.Supp.* 1344 (E.D.N.C.1974) (that foreign seller could "freely use North Carolina law to enforce its obligations" related to mobile home purchases is a factor to be considered in sustaining jurisdiction over foreign-state seller).

The dissent chides us for recalling these words of *Scripto*, which are reaffirmed in *National Geographic*. It calls attention to the number of wholesalers, salesmen, and jobbers who were active in Florida. However, the significance of *Scripto* lies not in the number of those persons, but in the fact that *none* was an employee of Scripto. They devoted only a part of their time to Scripto sales. *Scripto, supra*, 362 *U.S.* at 211, 80 *S.Ct.* at 621, 4 *L.Ed.*2d at 664. Even then, without in-state offices, without full-time resident employees, the Court found the "minimum connections" to be more than sufficient.

In considering then not what is absent, but what is present, we find distinctive contacts with the State of New Jersey not found in the precedent the taxpayer invokes. Unlike the mail order house in *National Bellas Hess*, or the department store in *Miller Brothers*, this seller of financial services has entered the taxing state to dun its customers, has used affiliated in-state offices for customers to drop payments, has used New Jersey credit service agencies, and has invoked the State's process to enforce its contracts. Surely the New Jersey borrowers did not consider themselves visited with only the "slightest presence" when Avco Pa. knocked on their doors to collect its money. Surely the New Jersey taxpayers are entitled to something in return for the benefits that the State conferred upon the foreign lender.[4]

---

[4]We note in addition that certain of Avco Pa.'s loan activities are subject to regulation in New Jersey. *Turner v. Aldens, Inc.*, 179 *N.J.Super.* 596 (App.Div. 1981) (state consumers have protection of Retail Installment Sales Act no matter from where seller deals). When foreign state business activities are conducted under a state regulatory scheme, the state confers a benefit for which it may ask something in return. *Evanston Ins. Co., Inc. v. Merin*, 598 *F.Supp.* 1290, 1309 (D.N.J.1984) ("Notwithstanding [*National Bellas Hess* holding that the minimal link is not present when a taxpayer's only connection with customers is by common carrier or mail] a state does have the power to impose tax liability on a seller if it has virtually any other contact with the state." Sarokin, J., *id.* at 1306, citing *Scripto* and *National Geographic* ).

■ We therefore believe that, applying the principles that the Supreme Court has laid down, it is well within the "realm of permissible judgment" to conclude that there are sufficient minimum contacts between the taxpayer and the State to justify the imposition of the tax.

## C.

### *Is There a Rational Relationship Between the Tax and the Instate Values?*

■ The rationality of relationship almost springs forth from the arithmetic in this case. The test is whether the tax liability is "out of all appropriate proportion to the business transacted." *Hans Rees' Sons, Inc. v. State of North Carolina ex rel. Maxwell,* 283 *U.S.* 123, 135, 51 *S.Ct.* 385, 389, 75 *L.Ed.* 879, 908 (1931), *cited in Silent Hoist, supra,* 100 *N.J.* at 10.

■ In this case, as a result of application of the three-part formula, only a distinct appropriate portion of Avco Pa.'s income was subject to tax. Its entire net income was in excess of $5,000,000 for each of the taxable years. As a result of the formula, less than $20,000 of that was attributed to New Jersey, although approximately $150,000 per year was derived from New Jersey borrowers. The taxes assessed for 1974 and 1975 on the entire net incomes of $5,225,745 and $5,867,326, respectively, were $1308 and $2123. The formula appears to have done "the job it was developed to do." *Silent Hoist, supra,* 100 *N.J.* at 10. In context, that amounts to a levy of less than 1% on the 1974 New Jersey gross, not a disproportionate factor considering the fact that branch managers spend 3 to 5% of their time in New Jersey. In light of the activities of the taxpayer in New Jersey to realize and continue these contractual relations, we cannot conclude that these figures are out of all appropriate proportion.

■ Nor is the Constitution offended because the taxpayer may have included some or all of the allocated $20,000 in

income in its Pennsylvania returns. Each of the states cannot police the activities of the others to guarantee that some overlap may not occur. "Taxation in one state is not an immunization against taxation in other states." *West Publishing Co. v. McColgan*, 27 *Cal*.2d 705, 710, 166 *P*.2d 861, 864, aff'd, 328 *U.S.* 823, 66 *S.Ct.* 1378, 90 *L.Ed.* 1603 (1946) (citations omitted); *see Moorman Mfg. Co. v. Bair*, 437 *U.S.* 267, 276–79, 98 *S.Ct.* 2340, 2346–47, 57 *L.Ed.*2d 197, 206–09 (1978); *State Tax Comm'n of Utah v. Aldrich*, 316 *U.S.* 174, 181, 62 *S.Ct.* 1008, 1011, 86 *L.Ed.* 1358, 1370 (1942). Many states have joined the Multistate Tax Compact to eliminate or minimize that potential.

In the last analysis, a wise commentator has put the limits of state taxing power in the simple context of whether the State "has exceeded the bounds of decency" in asserting its taxing power. Professor Thomas Reed Powell, *quoted in* Hellerstein, "State Taxation Under the Commerce Clause: An Historical Perspective," 29 *Vand.L.Rev.* 335, 350 (1976).

We are satisfied that given the homogeneous identity of Avco Pa. with its parent and management company, its own direct penetration of the New Jersey consumer finance market through its follow-up customer work, the employment of its New Jersey affiliates as collection offices, and its recurrent recourse to the protection that New Jersey's courts afford it as creditor, its activities establish a connection with the State which far exceeds the "slightest presence" suggested by the dissent. Given the fair allocation of income that New Jersey has sought, these bounds of constitutional decency have been met and disclose the required "minimum contacts" and "rational relationship" necessary to sustain the tax.

The judgment of the Appellate Division is affirmed.

CLIFFORD, J., dissenting.

Today the Court holds that a foreign corporation that does not maintain an office in New Jersey; does not employ officers,

employees, agents, or representatives with offices here; does not own or lease any real or tangible personal property in this state; and does not list itself in any New Jersey telephone directory is nonetheless subject to state taxation. So different from the majority's is my understanding of the stipulated record, my reading of the pertinent authorities, and my sense of justification for imposition of the corporate income tax that I register a dissent. On the facts before us there is not a sufficient nexus on which to support the tax.

Avco argues that in every instance in which a tax has been constitutionally imposed, the Supreme Court has found some physical presence, *i.e.,* some purposeful and deliberate resort by the nondomiciliary corporation to the taxing state's laws and services. Although not always written precisely in those terms, the pertinent decisions plainly favor Avco's position that a sustained, definite presence on the part of the taxpayer—not to be found in the instant case—is required.

In *Northwestern States Portland Cement Co. v. Minnesota,* 358 *U.S.* 450, 79 *S.Ct.* 357, 3 *L.Ed.*2d 421 (1959), a foreign corporation whose plant was located in Mason City, Iowa, made nearly 50 percent of its entire sales in Minnesota, the taxing jurisdiction. The corporation also maintained in Minnesota an office consisting of a secretary, three salesmen, and a district director. *Id.* at 454, 79 *S.Ct.* at 360, 3 *L.Ed.*2d at 425. Not surprisingly, the Court upheld the tax liability of the corporation, stating:

The taxes imposed are levied only on that portion of the taxpayer's net income which arises from its activities within the taxing State. These activities form a sufficient nexus between such a tax and transactions within a state for which the tax is an exaction. *It strains reality to say, in terms of our decisions, that * * * the corporation[ ] here was not sufficiently involved in local events* to forge some definite link, some minimum connection sufficient to satisfy due process requirements.

[*Id.* at 464, 79 *S.Ct.* at 365, 3 *L.Ed.*2d at 431 (emphasis added).]

Likewise, in *Standard Pressed Steel Co. v. Washington Revenue Dep't,* 419 *U.S.* 560, 95 *S.Ct.* 706, 42 *L.Ed.*2d 719 (1975), the Court sustained a tax against a nondomiciliary

corporation that had some physical presence within the taxing jurisdiction. In *Standard Pressed Steel,* a Pennsylvania manufacturer sold fasteners and other parts to the Boeing Company in Seattle, Washington. In order to facilitate consultation with Boeing regarding its anticipated needs and requirements, the manufacturer stationed in Washington an employee who was paid a salary and who operated out of his home. The employee was assisted by a group of the manufacturer's engineers who visited Seattle about three days every six weeks, or at least 24 days a year. *Id.* at 561, 95 *S.Ct.* at 708, 42 *L.Ed.*2d at 722. In upholding tax liability, the Court stressed that the manufacturer's employee, with a full-time position within the state, "made possible the realization and continuance of valuable contractual relations between [the manufacturer] and Boeing." *Id.* at 562, 95 *S.Ct.* at 708, 42 *L.Ed.*2d at 722.

In *Scripto, Inc. v. Carson,* 362 *U.S.* 207, 80 *S.Ct.* 619, 4 *L.Ed.* 2d 660 (1960), the Court was faced with a somewhat different problem, namely, the application of a so-called "use" tax. Briefly stated, this form of levy imposes on a corporation responsibility for the collection of a tax on certain goods or products. Not as direct as the income tax, a tax on use is nonetheless governed by the same constitutional standards that apply to a tax on income, requiring some minimal connection between the taxpayer's activity and the taxing state. In *Scripto,* a foreign corporation maintained ten brokers within the taxing jurisdiction for the purpose of soliciting sales. Each of the wholesalers was under the contractual employ of the corporation, and each was a resident of the taxing state. In upholding the tax against the corporation, the Court stressed that the brokers or salesmen were conducting "continuous local solicitation" in the taxing jurisdiction. That circumstance, coupled with the nondiscriminatory nature of the tax, was sufficient to sustain it. *Id.* at 211, 80 *S.Ct.* at 621, 4 *L.Ed.*2d at 663, 664.

The majority somehow concludes that Avco's overall affairs in New Jersey amount to a "substantial physical presence," and, more specifically, that its collection activity evidences a

"vigorous, systematic and persistent effort" to exploit the New Jersey market. *Ante* at 38. No such thing. Recall that the record before us amounts to a Rule 8:8–1(b) stipulation of facts—no room for creative interpretation here, no margin for massaging. Return with me, then, to the lamp, and re-read the stipulation. It takes little study to uncover that which. is plainly so: there is no continuous solicitation by Avco in New Jersey, nor are there any physical plants or offices here. Quite to the contrary, Avco operates offices exclusively in Pennsylvania and is not authorized to do business in any other state. It has no offices in New Jersey nor does it have officers, employees, agents, or representatives whose offices are located here. Avco neither owns nor leases any real or tangible personal property in New Jersey, nor is it listed in any New Jersey telephone directories.

The Court emphasizes Avco's so-called "distinctive contacts" with New Jersey, which appear by the majority's own analysis to be little more than random visits by collectors to New Jersey borrowers and the occasional use of in-state offices and of our courts to facilitate payments. *Ante* at 39. The Tax Court considered each of these factors and found it to be clearly *de minimis* and therefore an insufficient basis on which to sustain a tax. 4 *N.J.Tax* at 357. I agree. The record indicates that somewhere around one-half percent of Avco's total outstanding loans to New Jersey borrowers were collected through the use of our courts, and that Avco's managers spent about three to five percent of their working time in the state. These contacts, as "distinctive" as they might be, do not amount to a "substantial physical presence" by any reasonable definition of that term.

The situation before us is a far cry from the legitimate example of a "substantial physical presence" found in *Roadway Express, Inc. v. Director, Div. of Taxation,* 50 *N.J.* 471 (1967). There, a Delaware trucking corporation maintained two terminals in New Jersey, one in Kearny and the other in Bound Brook. The terminals were part of the company's interstate

network, servicing an estimated 100 trucks a week. Additionally, more than 60 vehicles were regularly parked in Kearny and registered, licensed, and inspected in the state. *Id.* at 478. In sustaining a franchise tax against the corporation, this Court emphasized the "physical nature" of the Kearny terminal and the company's "very substantial" activities in New Jersey. *Id.* at 479. It is important to note, however, that the Kearny facility was comprised of a two-story office building, a one-story loading dock, and a one-story service garage. Employed in this facility were three management representatives, six dispatchers, three supervisors, 55 dock employees, an office manager, a claim supervisor, 48 clerical workers, six garage employees, and a sales manager in charge of five salesmen. *Id.* at 479–80. With respect to other activities, the Court found that the company's vehicles used over two and a half million miles of New Jersey roadway, and the corporation itself derived over $5,000,000 from operations in this State. *Id.* at 479. The activities of the taxpayer in the instant case do not approach the activities demonstrated in *Roadway Express*.

Another illustration of a "vigorous, systematic and persistent effort" to exploit the New Jersey market is found in *Tuition Plan of New Hampshire v. Taxation Div., Director*, 4 *N.J.Tax* 470 (Tax Ct.1982). There, a foreign corporation was in the business of making educational loans and derived its income wholly from the interest that it charged to its borrowers. Significantly, although it did not maintain an office here, the company made use of its district managers from other areas whose respective districts included New Jersey. It was the job of these district managers to drum up business in New Jersey on behalf of the plaintiff corporation. As the court concluded:

Plaintiff, through its district managers, engaged in a systematic, regular program of on-site solicitation and exploitation of the New Jersey market. Plaintiff's representatives paid regular visits to New Jersey educational institutions; they were physically present in this State at least 54 times during each of the years 1974 and 1975 and at least 59 times during each of the years 1976 and 1977. One of plaintiff's district managers assigned to New Jersey estimated that he spent as much as 20% of his time in this State. The recurring visits of

two district managers to New Jersey "made possible the realization and continuance of valuable contractual relations" between plaintiff and the targeted New Jersey schools. *Standard Pressed Steel Co. v. Washington Dep't. of Revenue*, 419 *U.S.* 560, 95 *S.Ct.* 706, 42 *L.Ed.*2d 719 (1975).
[*Id.* at 479.]

By contrast, no one in the employ of Avco is charged with carrying out such a program of solicitation in New Jersey.

Indeed, Avco's activities in New Jersey differ only slightly in degree from the level of the taxpayer's activity in *Miller Bros. Co. v. Maryland*, 347 *U.S.* 340, 74 *S.Ct.* 535, 98 *L.Ed.* 744 (1954). There, the State of Maryland sought to levy a use tax against a merchandising corporation that sold products directly to customers at its store in Wilmington, Delaware. Nearby residents of Maryland would travel to the store and buy items, some of which were delivered to their homes by the corporation's own truck. In addition to making these deliveries, the corporation mailed circulars to former customers, including customers in Maryland, and it also did some general advertising that reached into the taxing state. *Id.* at 342–43, 74 *S.Ct.* at 537–38, 98 *L.Ed.*2d at 747. Despite the foregoing activities the Supreme Court concluded that there was an insufficient nexus on which to sustain a tax.

Finally, in *National Bellas Hess Inc. v. Department of Revenue of Illinois*, 386 *U.S.* 753, 87 *S.Ct.* 1389, 18 *L.Ed.*2d 505 (1967), the State of Illinois sought to levy a use tax against a mail order house that had its principal place of business in North Kansas City, Missouri. The corporation did not maintain any office in Illinois, did not have any agent or salesman in the state, did not own any tangible property in the taxing jurisdiction, and did not advertise its merchandise in newspapers or by radio or television. The company's only contacts with its Illinois customers were via the mail or common carrier. *Id.* at 754–55, 87 *S.Ct.* at 1389–90, 18 *L.Ed.*2d at 507. Relying in part on *Miller*, the Court had little difficulty in invalidating the tax.

In holding in favor of the Director, the Appellate Division, whose decision the majority now affirms, stated that the trial

court, although using the correct standards, had "failed to appreciate the minimum showing that a taxing district such as New Jersey would have to make as to the activities that would provide a basis for income taxation." 193 *N.J.Super.* at 507. The court emphasized that the internal regulation of the credit market and the regulation of certain commercial items, such as installment paper, could all be used as a basis for taxation. *Id.* at 512.

In underscoring the adequacy, for taxing purposes, of a "minimum" showing, the Appellate Division apparently overlooked the Supreme Court's decision in *National Geographic v. California Bd. of Equalization*, 430 *U.S.* 551, 97 *S.Ct.* 1386, 51 *L.Ed.*2d 631 (1977). Although the majority does not ignore the case, it does maul it a bit by applying its principle to the facts before us. In *National Geographic* the State of California sought to levy a use tax on a nondomiciliary corporation that maintained two offices within the taxing jurisdiction. In sustaining the tax, the California Supreme Court suggested that "the slightest presence within such taxing state" could form the basis of taxation. *Id.* at 556, 97 *S.Ct.* at 1390, 51 *L.Ed.*2d at 637. Although the United States Supreme Court affirmed the taxpayer's liability, the Court was careful to state:

> Our affirmance of the California Supreme Court is not to be understood as implying agreement with that court's "slightest presence" standard of constitutional nexus. [The taxpayer's] maintenance of two offices in the State and solicitation by employees assigned to those offices of advertising copy in the range of $1 million annually * * * establish a much more substantial presence that the expression "slightest presence" connotes.
>
> [*Id.*]

Thus, the Court relied on the physical location of the taxpayers' two offices as a basis for sustaining the tax.

The majority's labored reference to *National Geographic* and *Scripto, Inc. v. Carson, supra,* 362 *U.S.* 207, 80 *S.Ct.* 619, 4 *L.Ed.*2d 660, attests to the difficult position in which those cases put the Court—sort of *a fronte praecipitium a tergo lupi* (roughly, between a rock and a hard place). Surely they lend no support for the majority's astonishing position that in

the absence of such factors as an in-state office, in-state representatives, in-state property holdings, or, at the very least, in-state solicitation, a taxpayer may nevertheless be subject to taxation. The Supreme Court's reliance, in *National Geographic*, on *Scripto*, makes the point, unmistakably: *even though* the taxpayer in *Scripto* had no office or place of business or property or regular full-time employees in Florida, it nevertheless was subject to Florida tax because of its other activities there, namely, (1) maintenance of ten wholesalers, jobbers, or salesmen (2) continuously soliciting orders in Florida and (3) forwarding those orders from Florida to the taxpayer's home base in Georgia for (4) shipment back to Florida—quite a different picture from that painted by this Court. Focusing on Scripto's ten "wholesalers, salesmen, and jobbers who were active in Florida," *ante* at 40, the majority dismisses their numbers as unimportant but attaches surpassing significance to the fact that even though *"none* was an employee" of the taxpayer, the foreign corporation was nevertheless subject to tax.

Come now. The contractual relationship between Scripto and its salesmen in Florida is a matter of complete indifference to the holding of the case. It is what that horde of salesmen did that counts. The critical point, again, is that Scripto maintained in Florida its resident brokers who descended, much as a swarm of locusts, on prospective customers for the purpose of actively engaging in "attracting, soliciting and obtaining" business. 362 *U.S.* at 209, 80 *S.Ct.* at 621, 4 *L.Ed.*2d at 663. The test, as the Supreme Court sensibly observed, is "simply the nature and extent of the activities of the [taxpayer]" in the taxing state, *id.* at 211–12, 80 *S.Ct.* at 622, 4 *L.Ed.*2d at 664, rather than who performed those activities on behalf of the taxpayer. And Scripto's activities, as I have endeavored to demonstrate, bear little resemblance to Avco's. The two cases illustrate the difference between a "substantial presence" and "the slightest presence"—a difference significant enough to call for the tax in one instance and not the other.

Contrary to the majority's suggestion, I have drawn attention to *Scripto* again not in the spirit of chiding, see *ante* at 40 so much as of depression, even sheer, miserable frustration, that the Court and I can ascribe to the simple language of that case such diametrically different meanings. Clearly, the five in the majority are wrong, or I am. The numbers favor them, so I must leave it with the careful reader of these opinions and of the authorities on which we rely.

It is my view that the tax against Avco ought to be invalidated. At best, the taxpayer maintains only the "slightest presence" in New Jersey, a standard of constitutional nexus specifically and emphatically rejected by the Supreme Court but nevertheless adopted today by this Court. I would therefore reverse the judgment of the Appellate Division and reinstate the judgment of the trial court.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK and O'HERN—4.

*For reversal*—Justice CLIFFORD—1.