FIRST FAMILY MORTGAGE CORPORATION OF FLORIDA, PLAIN-TIFF-APPELLANT, v. LINDA A. DURHAM AND MR. LINDA DURHAM, DEFENDANTS, AND ATTORNEY GENERAL OF NEW JERSEY, INTERVENOR-RESPONDENT.

Argued October 7, 1986—Decided August 4, 1987.

*William M.E. Powers, III,* argued the cause for appellant (*William M.E. Powers, Jr.,* attorney).

*Harry Z. Haushalter,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

The sole issue in this case is whether the Corporation Business Activities Reporting Act (the Reporting Act), *N.J.S.A.* 14A:13–14 to –23, violates the commerce clause, *U.S. Const.*

art. I, ¶ 8, cl. 3, or the supremacy clause, *U.S. Const.* art. VI, ¶ 2.

Plaintiff, First Family Mortgage Corporation of Florida, a Florida Corporation whose principal place of business is in Illinois, violated the Reporting Act by failing to file a Notice of Business Activities Report (Activities Report) as required by *N.J.S.A.* 14A:13–15. Failure to file a timely Activities Report bars a foreign corporation from maintaining any action or proceeding in any state or federal court in New Jersey to enforce any cause of action accruing during an accounting period in which the corporation failed to file an Activities Report. *N.J.S.A.* 14A:13–20b. Pursuant to *N.J.S.A.* 14A:13–20b, the trial court dismissed plaintiff's mortgage foreclosure suit. The Appellate Division affirmed. 205 *N.J.Super.* 251 (1985). We granted plaintiff's motion for leave to appeal, 103 *N.J.* 507 (1986).

We now sustain the constitutionality of *N.J.S.A.* 14A:13–20 and hold that the State can require a foreign corporation to file an Activities Report and can withhold access to courts *until* the corporation complies. However, once a foreign corporation files an Activities Report and meets the requirements of *N.J. S.A.* 14A:13–20c(2), the commerce clause requires that the corporation be allowed to pursue any cause of action existing at the time of the filing (or accruing during that accounting period) regardless of when it arose.

I

Plaintiff invests in and services mortgages guaranteed by the Veteran's Administration and Farmer's Home Administration, and acts as a servicing custodian for Government National Mortgage Association (GNMA) loans. Plaintiff does not have a certificate of authority to do business in this state, does not file a New Jersey corporation business tax return or a New Jersey corporation income tax return, and has no officers, employees, or representatives in New Jersey. While plaintiff does not

originate any loans in New Jersey, it does own loans secured by New Jersey real estate. Such loans provide plaintiff with more than $25,000 per year in interest income.

On July 24, 1980, plaintiff acquired fifty-four GNMA home mortgages secured by New Jersey real estate from Midstate Mortgage and Service Company, an Illinois corporation. Defendants, Mrs. and Mr. Linda A. Durham, were the mortgagors on one of these mortgages. On January 1, 1983, defendants defaulted on their monthly payment to plaintiff. Plaintiff's representatives communicated with defendants by mail and telephone in an attempt to collect on the delinquent account. When these efforts failed, plaintiff instituted a mortgage foreclosure action in the Chancery Division.

The trial court dismissed plaintiff's action because plaintiff had failed to comply with the Reporting Act. The court based its ruling on *Associates Consumer Discount Co. v. Bozzarello*, 149 *N.J.Super.* 358 (App.Div.1977), which upheld the constitutionality of the Act. Nonetheless, the court opined that the Reporting Act, as applied to plaintiff, violated the commerce clause. This view was based upon the court's interpretation of *Allenberg Cotton Co., Inc. v. Pittman*, 419 *U.S.* 20, 95 *S.Ct.* 260, 42 *L.Ed.*2d 195 (1974), and related Supreme Court decisions holding that a state cannot require a foreign corporation engaged solely in interstate commerce to obtain a license to do business within that state.

The Appellate Division affirmed, distinguishing this case from the licensing cases on the ground that the Reporting Act, unlike the typical licensing statute, "does not expose foreign corporations engaged solely in interstate commerce to lawsuits in this state. It merely requires that foreign corporations receiving substantial annual payments from New Jersey residents file information that will enable New Jersey to determine whether they are exempt from taxation." 205 *N.J.Super.* at 255. The court also rejected plaintiff's argument that the Reporting Act violates the supremacy clause by undermining

the policy of the National Housing Act: "The slight inconvenience of filing the notice [Activities Report] will not destroy the market for GNMA mortgages on homes in New Jersey and in other states having a similar requirement."[1]  *Id.*

## II

*N.J.S.A.* 14A:13–15 provides in pertinent part:

Every foreign corporation which during any calendar or fiscal accounting year ending after December 31, 1973, carried on any activity or owned or maintained any property in this State, unless specifically exempted under section 3 of this act, shall be required to file a notice of business activities report, as hereinafter provided.

Activities or property maintenance in this State which require corporations to file this report are:

*       *       *       *       *       *       *       *

e. receiving payments from persons residing in this State, or businesses located in this State, aggregating in excess of $25,000 regardless of any other connections with this State;

*       *       *       *       *       *       *       *

Every foreign corporation subject to the Reporting Act must file an Activities Report with the Director of the Division of Taxation of the State of New Jersey, on or before the fifteenth day of the fourth month after the close of the corporation's calendar or fiscal accounting year. *N.J.S.A.* 14A:13–18a. Pursuant to *N.J.S.A.* 14A:13–16b, a foreign corporation is not required to file, if it has received either a certificate of authority to do business in this state or has filed a timely tax return under the Corporation Business Tax Act, *N.J.S.A.* 54:10A–1 to –40, or the Corporation Income Tax Act, *N.J.S.A.* 54:10E–1 to –24 (the Second Tier Income Tax).[2]

---

[1]The Appellate Division found there was an insufficient factual record to sustain the Chancery Division's conclusion that plaintiff was not engaged in intrastate business activities. 205 *N.J.Super.* at 256. We agree.

[2]*N.J.S.A.* 14A:13–16 provides:

A foreign corporation shall not be required to file a notice of business activities report if

*N.J.S.A.* 14A:13–20a and b set forth sanctions for a foreign corporation's failure to file an Activities Report:

a. No foreign corporation carrying on any activity or owning or maintaining any property in this State which has not obtained a certificate of authority to do business in this State and disclaims liability for the corporation business tax and the corporation income tax shall maintain any action or proceeding in any State or Federal court in New Jersey, until such corporation shall have filed a timely notice of business activities report.

b. The failure of a foreign corporation to file a timely report shall prevent the use of the courts in this State for all contracts executed and all causes of action that arose at any time prior to the end of the last accounting period for which the corporation failed to file a required timely report.

However, a court may excuse a corporation's failure to file an Activities Report

where the court finds the corporation has sustained the burden of establishing that

(1) the failure to file a timely report was done in ignorance of the requirement to file, such ignorance was reasonable in all circumstances;

(2) all taxes, interest and civil penalties due the State for all periods have been paid, or provided for by adequate security or bond approved by the director, before the suit may proceed. [*N.J.S.A.* 14A:13–20c.]

The Reporting Act was recommended in the *Report of the New Jersey Tax Policy Committee,* Vol. V, at 32–34 (*Report*) submitted to Governor William T. Cahill on February 23, 1972. The *Report* recommended that New Jersey do as many other states had done, "by adding to their corporate franchise taxes, or by substituting for them, an income tax levied, not on the privilege, or the doing of business in the State, but on income derived from sources within the State." *Id.* at 20. It explained that "equity demands business carrying on activities in the State and exploiting the New Jersey market make some contribution to the costs of maintaining governmental operations and the services provided by the State...." *Id.* at 22. The *Report*

---

a. by the end of an accounting period for which it was otherwise required to file a notice of business activities report under this act, it had received a certificate of authority to do business in this State; or

b. a timely return has been filed under the Corporation Business Tax Act or the Corporation Income Tax Act for such accounting period. [ (footnotes omitted) ]

recommended the enactment of a "second tier" income tax to impose a tax on foreign corporations neither qualified nor doing business within the state in the traditional franchise tax sense (who do not maintain an office or employ or own property or capital in the state), but who, nevertheless, derive income from sources in the state and have an adequate due process nexus with New Jersey to give the state jurisdiction to tax.[3] The Tax Policy Committee recognized that for the Second Tier Income Tax to be effective, the state had to be able to locate those foreign corporations that would be subject to the new proposed tax:

> [I]t is important, in order to safeguard the State's revenues and reduce unfair taxfree competition with businesses that pay taxes to this State, that the Legislature adopt a more effective technique for discovering foreign corporations that may be taxable, but that are now paying no taxes, and would otherwise escape the broadened jurisdiction of the proposed second tier tax. To seek to accomplish that objective, we propose that a statutory provision be adopted requiring certain non-qualified foreign corporations to file with the Division of Taxation a Notice of Business Activities. [*Report, supra,* at 33].

Moreover, the *Report* specifically stated the reason for *N.J.S.A.* 14A:13–15e:

> It would also appear desirable, in order to establish a simple, objective quantitative test for the filing of the Notice to require any foreign corporation that receives payments from persons residing in the State, or business located in the State, aggregating a minimum dollar amount to be designated by the statute, to file the Notice, regardless of any other connections with the State. [*Report, supra,* at 34].

The Legislature adopted the Tax Policy Committee's recommendations and enacted the Reporting Act, in conjunction with the Corporation Income Tax Act (the Income Tax), making both Acts effective on June 7, 1973. As part of the Reporting Act, the Legislature adopted *N.J.S.A.* 14A:13–15e, viewing the receipt of at least $25,000 per year "as at least a preliminary

---

[3]The Corporation Income Tax is a tax on a corporation's "entire net income," measured in the first instance by the corporation's federal taxable income. *N.J.S.A.* 54:10E–4i. This income is apportioned to New Jersey by application of a three part formula based upon receipts, property, and payroll within and outside the state. *N.J.S.A.* 54:10E–6.

indication that a foreign corporation derived income from sources within New Jersey and was subject to the corporation income tax." *Avco Fin. Servs. Consumer Discount Co. One, Inc. v. Director, Div. of Taxation*, 100 *N.J.* 27, 32 (1985).[4]

## III

The commerce clause of the United States Constitution, although phrased as an affirmative grant of power to Congress to regulate foreign and interstate commerce, is "a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 *U.S.* 82, 87, 104 *S.Ct.* 2237, 2240, 81 *L.Ed.*2d 71, 76 (1984). This limitation, however, is not absolute. States "retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis v. BT Inv. Managers, Inc.*, 447 *U.S.* 27, 36, 100 *S.Ct.* 2009, 2015, 64 *L.Ed.*2d 702, 711 (1980).

In general, a "[s]tate regulation affecting commerce will be upheld if (a) the regulation is rationally related to a legitimate state end, and (b) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the state interest in enforcing the regulation." L. Tribe, *American Constitutional Law* § 6–5 at 326 (1978). As stated by the Court in *Pike v. Bruce Church, Inc.*, 397 *U.S.* 137, 142, 90 *S.Ct.* .844, 847, 25 *L.Ed.*2d 174, 178 (1970):

Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit*, 362 *U.S.* 440, 443 [80 *S.Ct.* 813, 816, 4 L.Ed.2d 852 (1960)]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the

---

4It is undisputed that plaintiff satisfies all the conditions that would bar it from maintaining this action under the Reporting Act and fullfills none of the Act's exceptions. Accordingly, unless the Reporting Act is deemed unconstitutional, plaintiff is barred from maintaining its foreclosure suit.

> burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. [citation omitted]

Notwithstanding this general rule, a statute will be held *per se* invalid if its sole purpose is economic protectionism: "where simple economic protectionism is effected by state legislation, a virtual *per se* rule of invalidity has been erected." *Philadelphia v. New Jersey*, 437 *U.S.* 617, 624, 98 *S.Ct.* 2531, 2535, 57 *L.Ed.*2d 475, 481 (1978). The purpose of the Reporting Act is to achieve a substantial and legitimate state interest, not to encourage simple economic protectionism of local businesses at the expense of interstate commerce. The history of the Act conclusively establishes that it was enacted to

> enable the Division of Taxation to obtain pertinent data from any foreign corporation which carries on an activity or runs or maintains property in this State but which has not obtained a certificate of authority to do business in New Jersey, to the end that a proper determination may be made as to whether such corporation is subject to any State tax. [*Avco Fin. Servs. Consumer Discount Co. One, Inc. v. Director, Div. of Taxation, supra,* 100 *N.J.* at 33 (*quoting Associates Consumer Discount Co. v. Bozzarello, supra,* 149 *N.J.Super.* at 362).][5]

Plaintiff contends that the Supreme Court has created a second exception to the balancing rule in a series of decisions that invalidated state statutes that imposed licensing requirements on foreign corporations engaged solely in interstate commerce.[6] Plaintiff argues that the Reporting Act is an

---

[5]As we recognized in *American Bank & Trust Co. of Pennsylvania v. Lott,* 99 *N.J.* 32, 39 (1985):

> This exception for timely filing a relevant corporate tax return underscores the basic purpose of the Reporting Act, which is to provide the Division of Taxation with information to determine the tax liability of foreign corporations. *Associates Consumer Discount Co. v. Bozzarello,* 149 *N.J.Super.* 358, 362 (App.Div.1977). Consistent with that purpose, the notice of business activities report form is issued by the Division of Taxation and is filed with that Division.

[6]Plaintiff relies on our decision in *Coons v. American Honda Motor Co.,* 94 *N.J.* 307 (1983), *cert.* denied, 469 *U.S.* 1123, 105 *S.Ct.* 808, 83 *L.Ed.* 2d 800 (1985). In that case, we held that the statute that tolls the running of statute of limitations in actions against foreign corporations that are not "represented" in

unconstitutional "forced licensure" statute despite the clear evidence that the goal of the Reporting Act is merely to provide information that will help the state collect the Corporate Income Tax.

It is true that the Supreme Court has held that forced licensure statutes violate the Commerce Clause. *See Allenberg Cotton Co. v. Pittman, supra,* 419 *U.S.* 20, 95 *S.Ct.* 260, 42 *L.Ed.*2d 195 (statute withheld access to courts from foreign corporations doing business within the state without certificates of authority); *Dahnke-Walker Milling Co. v. Bondurant,* 257 *U.S.* 282, 291, 293, 42 *S.Ct.* 106, 108, 109, 66 *L.Ed.* 239, 244, 245 (1921) (a state cannot by statute "impose burdensome conditions" on interstate commerce; a "corporation of one state may go into another, without obtaining the leave or license of the latter, for all the legitimate purposes of such commerce"); *Sioux Remedy Co. v. Cope,* 235 *U.S.* 197, 35 *S.Ct.* 57, 59 *L.Ed.* 193 (1914) (statute withheld access to courts from foreign corporations doing business in the state until it filed its Articles of Incorporation with the state and appointed a resident upon whom service of process could be served); *International Textbook Co. v. Pigg,* 217 *U.S.* 91, 30 *S.Ct.* 481, 54 *L.Ed.* 678 (1910) (state could not require foreign corporation to file a "complete detailed statement of the condition of such corporation" including information about its officers, directors, managers, assets, liabilities, and capital stock).

Nonetheless, a close analysis of those forced licensure cases discloses that in each of the cases the Court found that the qualification statute imposed *unreasonable* conditions on the foreign corporation's right to sue in a state court. As we stated in *Materials Research Corp. v. Metron, Inc.,* 64 *N.J.* 74, 79 (1973):

---

the state was a forced licensure statute. Hence, we found it unconstitutionally burdened interstate commerce by requiring a foreign corporation engaged exclusively in interstate commerce to obtain a certificate to do business in New Jersey in order to gain the benefit of the statute of limitations.

the law has long been settled that a state may not impose a qualification statute *which unduly burdens interstate commerce, Dahnke-Walker Milling Co. v. Bondurant,* 257 *U.S.* 282, 42 *S.Ct.* 106, 66 *L.Ed.* 239 (1921); *see, e.g., International Text-book Co. v. Pigg,* 217 *U.S.* 91, 30 *S.Ct.* 481, 54 *L.Ed.* 678 (1910); *Sioux Remedy Co. v. Cope,* 235 *U.S.* 197, 35 *S.Ct.* 57, 59 *L.Ed.* 193 (1914). [ (emphasis added.) ]

An analysis of the Reporting Act shows how it differs from licensing statutes and discloses that it does not unduly burden interstate commerce. First, the Reporting Act does not require every foreign corporation doing business in New Jersey to file an Activities Report. Instead, the reporting requirement is carefully limited to those corporations that satisfy any of the conditions cited in *N.J.S.A.* 14A:13–15, and are therefore likely to owe a tax.

Moreover, the burden imposed on a foreign corporation by the Reporting Act is minimal. Unlike a licensing statute, the Reporting Act does not require a foreign corporation to obtain permission from the state prior to doing business here. The Act does not force foreign corporations to secure a certificate of authority to do business or any other license in New Jersey. Moreover, licensing statutes generally require corporations to submit to in-state service of process. L. Tribe, *supra,* § 6–13 at 342; *see, e.g., N.J.S.A.* 14A:13–4(1)(d). In order to secure a certificate of authority to do business in New Jersey, a foreign corporation must maintain a registered agent within the state to accept service of process, file with the Secretary of State an annual report and a copy of its corporate charter, and submit to the Corporation Business Tax, which imposes a higher rate of tax than the second tier income tax. *N.J.S.A.* 14A:13–4(1); *N.J.S.A.* 54:10A–2. Such requirements are strong disincentives for many corporations from doing interstate business in this state, especially if the amount of their business would be minimal.

The information required by the Activities Report is easily accessible to the corporation. The Report form merely asks a corporation to provide identification information (name, address, place of incorporation, etc.), and then asks whether the

corporation satisfies any of the conditions listed in *N.J.S.A.* 14A:13–15. The form also asks the corporation whether it has any liability under the Second Tier Tax Act.

■ Furthermore, compliance with the Reporting Act does not subject a foreign corporation to any tax liability or result in any other consequences. Rather, the notice requirement is merely an information gathering tool that permits the Division of Taxation to initiate an investigation to determine whether the foreign corporation having commercial contacts with the state may be liable for the constitutionally valid New Jersey Second Tier Income Tax.[7] Without the benefit of the information contained in the Activities Report, the Director would find it almost impossible to determine which foreign corporations are doing business in New Jersey and which are liable under the Second Tier Income Tax Act. The Director would be greatly dependent on voluntary compliance with the Tax Act. This would deprive the state of revenue, be unfair to those corporations that comply voluntarily, and give an unfair advantage to those corporations that avoid the tax. Therefore, we hold that it is constitutional for New Jersey to require foreign corporations that satisfy the conditions in *N.J.S.A.* 14A:13–15 to file an Activities Report.

IV

This holding, however, does not end our inquiry because the Reporting Act also imposes an important sanction for noncompliance. Failure to file an Activities Report prevents a corporation from using New Jersey courts to pursue any cause of action arising "at any time prior to the end of the last accounting period for which the corporation failed to file a required timely report." *N.J.S.A.* 14A:13–20b. It is this harsh penalty that we find constitutionally infirm.

---

[7]The constitutionality of the tax was upheld in *Avco Financial Services Consumer v. Director, supra,* 100 *N.J.* 27.

It is without question that *N.J.S.A.* 14A:13–20b is rationally related to the State's interest in maintaining compliance with the Reporting Act. The prospect of being unable to enforce an important contract will encourage corporations to file the Activities Report. The provision will also aid in detecting those corporations that have violated the Act because defendants will have a strong incentive to raise the Reporting Act as a defense.

The concurring and dissenting opinion of Wilentz, C.J., would have us uphold *N.J.S.A.* 14A:13–20b on these grounds, without further analysis. It disapproves of balancing tests in no uncertain terms: " '[S]uch an inquiry is ill suited to the judicial function and should be undertaken rarely if at all.' " *Post* at 307 (quoting *CTS Corp. v. Dynamics Corp.*, —— *U.S.* ——, ——, 107 *S.Ct.* 1637, 1652, 95 *L.Ed.*2d 67, 89 (1987) (Scalia, J., concurring)). While the opinion does purport to apply a balancing test, its emphasis upon the interests of the state, to the exclusion of any discussion of the burdens placed on interstate commerce, ensures that the vast majority of, if not all, non-protectionist restraints on interstate commerce will receive judicial approval. We find such an approach inconsistent with the spirit of the commerce clause and governing case law.

Applying a balancing test, we find that the state's interest in maintaining compliance with the Reporting Act is insufficient to justify the burden placed on interstate commerce by *N.J.S.A.* 14A:13–20b. Without the right to enforce contracts made in interstate commerce, the right to engage in such commerce is severely restricted. This stiff sanction applies without regard to whether the corporation is actually liable for any tax. Moreover, the penalty (the value of the lost cause of action) may be completely disproportionate to any tax that might be due. In addition, the statute gives a windfall to

defendants that they can exploit for their own economic advantage.[8]

However, the unconstitutionality of the enforcement provision as written does not require us to invalidate the entire Reporting Act or leave the Reporting Act without any enforcement provision. Where part of a statute is unconstitutional, "a court has the power to engage in 'judicial surgery' and through appropriate construction restore the statute to health." *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 104 (1983) (citing *New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 75 (1980)); *Borough of Collingswood v. Ringgold,* 66 *N.J.* 350, 357 (1975), app. dism., 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L.Ed.*2d 826 (1976); *State v. DeSantis,* 65 *N.J.* 462, 472–73 (1974)). The relevant issue in each case is whether the Legislature would want the statute to survive. *New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, supra,* 82 *N.J.* at 75. This inquiry does not turn "simply upon whether the statute, if adjusted to the constitutional demand, will cover more or less than its terms purport to cover ... [T]he sounder course is to consider what is involved and to decide from the sense of the situation whether the Legislature would want the statute to succumb." *Id. (quoting Schmoll v. Creecy,* 54 *N.J.* 194, 202 (1969)).

We believe that the state's interest in enforcing the Reporting Act is adequately served by a provision that prohibits a

---

[8]The concurring and dissenting opinion of Wilentz, C.J., finds this reason for invalidating *N.J.S.A.* 14A:13–20b unpersuasive because "[i]n numerous contexts, the law permits private litigants to come away with a 'windfall' if doing so is the only or the most effective way of assuring that an important public interest is served." *Post* at 304. The opinion points to "[s]tatutes and common-law rules permitting plaintiffs to collect treble or punitive damages against malefactors...." *Post* at 304–305. We do not believe that the policy of awarding treble or punitive damages to certain innocent plaintiffs in order to encourage them to bring wrongdoers to court justifies allowing malefactors to escape liability for their wrongdoing because of the fortuity that their victims failed to comply with the Reporting Act.

corporation from using state courts until such time as the corporation files an Activities Report and the provisions of *N.J.S.A.* 14A:13–20c(2) are met.[9] This allows the corporation to enforce all its contracts and will force the corporation to provide the information the state needs to determine the corporation's tax liability. Admittedly, this enforcement provision is not as effective as *N.J.S.A.* 14A:13–20b because it will force compliance with the Reporting Act only after a corporation decides to bring a lawsuit in New Jersey courts. Nonetheless, we are convinced that due to the importance of the Reporting Act in enforcing the Tax Act, the Legislature would prefer this modified enforcement provision over the absence of an enforcement provision.[10] The conclusion that the Legislature would not view *N.J.S.A.* 14A:13–20b as an indispensible part of the Reporting Act is supported by the severability clause contained in *N.J.S.A.* 14A:13–23.

Accordingly, we conclude that to preserve the constitutionality of *N.J.S.A.* 14A:13–20b, the statute shall be interpreted to

[9]*N.J.S.A.* 14A:13–20c(2) provides:

all taxes, interest and civil penalties due the State for all periods have been paid, or provided for by adequate security or bond approved by the director, before the suit may proceed.

[10]The concurring and dissenting opinion of Wilentz, C.J., asserts that we have "effectively eliminated any sanction for noncompliance" with the Reporting Act. *Post* at 304. It suggests that as a result of our decision foreign corporations will comply only where the cost of compliance (paying taxes) does not exceed the value of the lost cause of action. *Post* at 303–304. "This will mean that only those foreign corporations which happen to have a need to use the New Jersey courts (or which have an uncharacteristic commitment to the rule of law) will end up supplying the Activities Report requested by the statute. It is hardly fair that compliance with the Act should turn on such a fortuity." *Post* at 304.

We find this argument unpersuasive because the effectiveness of the Reporting Act even as written depends upon this type of fortuity. Even under the concurring and dissenting opinion, a corporation will comply with the Reporting Act only if it concludes that the probable value of the causes of action it is likely to have in New Jersey courts exceeds the taxes that the corporation is likely to owe.

mean that a foreign corporation can pursue a cause of action in this state after filing an Activities Report and meeting the conditions of *N.J.S.A.* 14A:13–20c(2), regardless of whether the Report was filed in the same accounting period in which the cause of action arose. As one commentator has explained with respect to sanctions for violations of qualification statutes, this approach is not as effective as a permanent retroactive bar to the courts but is "preferred because it provides effective enforcement and yet is fair to the corporation." Note, Corporate Qualification Statutes, 63 *Colum.L.Rev.* 117, 130 (1963).[11] If the Legislature wishes to increase the deterrent effect of the Act, it may wish to amend the Act to also provide reasonable monetary penalties. *See id.* ("The need for deterrence can be met by a companion provision imposing monetary penalties.")

## V

Defendants also assert that the Reporting Act violates the supremacy clause because it frustrates the goals of the National Housing Act, 12 *U.S.C.A.* §§ 1701 to 1750g. Defendants argue that the burden of filing an Activities Report and the application of 14A:13–20 to disable a mortgagee from foreclosing on a mortgage in default will discourage lenders from making mortgage loans in New Jersey.

A state statute violates the supremacy clause

(1) where "Congress has either explicitly or implicitly declared that the states are prohibited from regulating" in this area, *Ray v. Atlantic Richfield Co.*, 435 *U.S.* 151, 157, 98 *S.Ct.* 988, 994, 55 *L.Ed.*2d 179 (1978) or (2) where a state statute "actually conflicts with a valid federal statute." *Id:* at 158, 98 *S.Ct.* at 994. [*McGlynn v. N.J. Public Broadcast Auth.*, 88 *N.J.* 112, 137 (1981).]

Since defendants have not alleged that Congress has prohibited the states from regulating in this area, we must consider only

---

[11]Of course, any foreign corporation that meets the exceptions set forth in *N.J.S.A.* 14A:13–20c(1) and (2) likewise may maintain a suit in New Jersey.

whether the Reporting Act "actually conflicts with a valid federal statute."

The test for determining whether actual conflict exists is "whether, under the circumstances of [a] particular case, [the state's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 *U.S.* 52, 67, 61 *S.Ct.* 399, 404, 85 *L.Ed.* 581 (1941), quoted in *Jones v. Rath Packing Co.,* 430 *U.S.* 519, 526, 97 *S.Ct.* 1305, 1310, 51 *L.Ed.2d* 604 (1977). [*McGlynn v. N.J. Public Broadcast Auth., supra,* 88 *N.J.* at 137.]

■  The purpose of the National Housing Act is "to establish secondary market facilities for home mortgages," 12 *U.S.C.A.* § 1716, and "to promote private activity in the building of low and moderate income housing through the use of federal credit," *United States v. Winthrop Towers,* 542 *F.Supp.* 1042, 1044 (N.D.Ill.1982). We see nothing in the Reporting Act, as modified in Section III of our opinion, that frustrates these goals. We do not think that compliance with the Reporting Act is so burdensome that lenders will shun the New Jersey mortgage market. Accordingly, we hold that the Reporting Act does not violate the supremacy clause.

As modified, we affirm the judgment of the Appellate Division.

WILENTZ, C.J., concurring and dissenting.

In *Avco Financial Services Consumer Discount Co. One v. Director, Division of Taxation,* 100 *N.J.* 27 (1985), we upheld this State's constitutional power to tax foreign corporations that derive income from sources within New Jersey. Today, the Court effectively deprives state officials of their most important means of assuring that the taxes which we said in *Avco* can be imposed in fact will be imposed. In the name of interstate commerce, the plurality has drained all effectiveness out of the Corporation Business Activities Reporting Act, reducing that statute to a supplication. Unable to agree that this anomalous result is consistent with the underlying purposes

and judicial interpretation of the dormant commerce clause, I dissent.[1]

## I.

The plurality opinion correctly frames the threshold doctrinal inquiry: whether the Reporting Act amounts to a *per se* violation of the commerce clause or whether it is to be judged under the balancing test laid down by the United States Supreme Court for state regulations having a legitimate nondiscriminatory purpose. *See Coons v. American Honda Motor Co.*, 94 *N.J.* 307, 316–17 (1983), *cert.* den., 469 *U.S.* 1123, 105 *S.Ct.* 808, 83 *L.Ed.*2d 800 (1985). And the plurality opinion correctly decides that the more accommodating balancing test applies. As explained *infra* at 300–308, I disagree with the plurality's application of that test to the statute challenged here. But before entering into that discussion, I want to spell out my reasons, which are somewhat different from the plurality's, for concluding that the balancing test should apply, that is, for concluding that a state's closing of its courthouse doors to a foreign corporation that refuses to comply with its legitimate regulations does not automatically transgress the dormant commerce clause.

At the heart of the dormant commerce clause lies a deep-seated concern over states adopting policies of economic protectionism—policies designed to enhance the welfare of one state's own economy at the expense of the economies of other states. The Supreme Court has translated this concern into law by reading into Congress' power to regulate interstate commerce, conferred by Article I, Section 8, Clause 3 of the Constitution, an *exclusive* power in certain matters off-limits to state encroachment, at least without congressional authorization. In giving a strong voice to this silent prohibition, the Court has recognized that the nation's political unity and economic pros-

---

[1] I concur in the plurality's disposition, in Part V of its opinion, of plaintiff's supremacy clause argument.

perity depend on a vibrant commercial intercourse across state boundaries and that discriminatory or protectionist state legislation poses a substantial threat to those vital national interests. *See generally H.P. Hood & Sons, Inc. v. Du Mond,* 336 *U.S.* 525, 69 *S.Ct.* 657, 93 *L.Ed.* 865 (1949); Regan, "The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause," 84 *Mich.L.Rev.* 1091, 1110–25 (1986); Smith, "State Discriminations Against Interstate Commerce," 74 *Calif.L.Rev.* 1203, 1206–10 (1986).

This anti-discrimination or anti-protectionism principle not only justifies the Court's exercise of its power to invalidate state legislation affecting interstate commerce but also, in large measure, circumscribes that power. "[N]ot every exercise of state authority imposing some burden on the free flow of commerce is invalid." *Hunt v. Washington State Apple Advertising Comm'n,* 432 *U.S.* 333, 349, 97 *S.Ct.* 2434, 2445, 53 *L.Ed.*2d 383, 398 (1977). Nondiscriminatory state regulations that advance some legitimate local interest have generally been sustained. Regan, *supra,* 84 *Mich.L.Rev.* at 1092; Smith, *supra,* 74 *Calif.L.Rev.* at 1204. Thus, whereas state legislation motivated by "simple economic protectionism" is subject to "a virtually per se rule of invalidity," *City of Philadelphia v. New Jersey,* 437 *U.S.* 617, 624, 98 *S.Ct.* 2531, 2535, 57 *L.Ed.*2d 475, 481 (1978), "[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.,* 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174, 178 (1970).

No contention has been, or could be, made in this case that the statute challenged by plaintiff is motivated by "economic protectionism." It is true that the Reporting Act has the effect of benefiting in-state economic actors and disadvantaging out-of-state corporations. But this is not the reason for its existence. Rather, in adopting the Reporting Act the Legislature

was seeking only to provide tax authorities with the means of discovering foreign corporations falling within the ambit of the Corporation Income Tax Act (CITA), *N.J.S.A.* 54:10E–1 to –24, which assesses a tax on income derived from sources within New Jersey. *See* 5 *Report of the New Jersey Tax Policy Committee* 33 (1972) (*Report*). CITA itself is a wholly legitimate attempt to impose taxes on value earned by foreign corporations from inside New Jersey bearing a fiscal relation to the protection, opportunities and benefits New Jersey affords these corporations. *Avco Fin. Servs. Consumer Discount Co. One v. Director, Div. of Taxation, supra,* 100 *N.J.* 27; *see ASARCO Inc. v. Idaho State Tax Comm'n,* 458 *U.S.* 307, 315, 102 *S.Ct.* 3103, 3108, 73 *L.Ed.*2d 787, 794 (1982). "[E]quity demands"—and as we held in *Avco,* the commerce clause permits—that "business carrying on activities in the State and exploiting the New Jersey market make some contribution to the costs of maintaining governmental operations and the services provided by the State. . . ." *Report, supra,* at 22. The fact that the Reporting Act, like the CITA, may have some incidental protectionist *effect* does not make it unconstitutional; protectionist *purpose* is what the commerce clause forbids. Regan, *supra,* 84 *Mich.L.Rev.* 1091.

Moreover, the Reporting Act does not discriminate between domestic and foreign corporations. Domestic corporations are also required to file tax returns providing information about their business activities subject to taxation, *see N.J.S.A.* 54:10A–14(b), –18, and are subject to various sanctions, including forfeiture of the corporate charter, for failure to pay taxes or file returns, *see N.J.S.A.* 54:10A–17, –22.

Against this backdrop, the Supreme Court cases most relevant in this case, the so-called "forced-licensure" decisions, have been viewed as somewhat puzzling, for they apply a *per se* rule of invalidity even though no state protectionism or discrimination appears to be involved. *See* Regan, *supra,* 84 *Mich.L.Rev.* at 1182, 1188–89. This line of cases invalidates state qualification statutes that force foreign corporations engaged in inter-

state commerce to register with the state on pain of losing access to the state's courts. *See Allenberg Cotton Co. v. Pittman,* 419 *U.S.* 20, 95 *S.Ct.* 260, 42 *L.Ed.*2d 195 (1974); *Dahnke-Walker Milling Co. v. Bondurant,* 257 *U.S.* 282, 42 *S.Ct.* 106, 66 *L.Ed.* 239 (1921); *Sioux Remedy Co. v. Cope,* 235 *U.S.* 197, 35 *S.Ct.* 57, 59 *L.Ed.* 193 (1914); *Buck Stove & Range Co. v. Vickers,* 226 *U.S.* 205, 33 *S.Ct.* 41, 57 *L.Ed.* 189 (1912); *International Text-Book Co. v. Pigg,* 217 *U.S.* 91, 30 *S.Ct.* 481, 54 *L.Ed.* 678 (1910).

The plurality distinguishes the forced-licensure decisions on the basis of various factual differences tending to minimize the Reporting Act's burden in comparison to that of the invalidated qualification statutes. But the plurality does not satisfactorily explain the relevance or importance of these distinctions, nor answer the dissenting opinion's contention that the damning feature of the forced-licensure statutes is their sanction barring a foreign corporation from enforcing contracts made in interstate commerce. This latter defect is particularly surprising given the plurality's subsequent strong emphasis, in the part of its opinion applying the balancing test, on the severity of the Act's door-closing sanction.

Were our task strictly one of determining how to achieve literal conformance to the Supreme Court's *statements*—as distinguished from its holdings—on this subject, I might agree with the dissenting opinion's conclusion that the *per se* rule applies here. Undeniably, the Court's forced-licensure opinions contain language strongly suggesting that states must keep open their courthouse doors to those seeking to enforce interstate contracts.[2] Absent a clear holding to this effect, how-

---

[2]Of special interest are Justice Douglas' conclusion in *Allenberg Cotton Co. v. Pittman, supra,* 419 *U.S.* at 34, 95 *S.Ct.* at 267, 42 *L.Ed.*2d at 206, that "Mississippi's refusal to honor and enforce contracts made for interstate or foreign commerce is repugnant to the Commerce Clause," and Justice Rehnquist's statement in his dissenting opinion in that case, implicitly rejected by the majority, that "our decisions hold that the burden imposed on interstate

ever, our inquiry must proceed further, to the wisdom of such a rule. And we should be most reluctant to take language to what admittedly may be its logical extreme where, as here, the consequence is to deprive the state of its power to do that which seems to offend no constitutional value or policy. Our ultimate responsibility is to arrive at a considered judgment as to how the Supreme Court, if faced with the question, would rule. I simply cannot believe the Supreme Court would hold that the dormant commerce clause requires us to invalidate an otherwise unobjectionable state regulation merely because it has the effect of rendering unenforceable a contract made in interstate commerce.

In circumstances such as these, we should ask whether there is an alternative interpretation of the case law that satisfies our obligation as an inferior tribunal on federal questions without sacrificing our convictions about what the Constitution means. I believe such an interpretation exists in this case.

In my view, the Supreme Court's forced-licensure decisions are properly read as focusing not on the severity of the door-closing sanction but on the illegitimacy of the underlying regulation to which the sanction attaches. The constitutional defect in the qualification statutes—and the key distinguishing factor between those statutes and the Reporting Act—is that the regulatory end they sought to achieve was invalid. By the time of these decisions, the principle had already been well-established that a state cannot require a foreign corporation to take out a doing-business license when in fact that corporation was not doing business in the state but was engaged solely in interstate commerce. *See, e.g., Crutcher v. Kentucky,* 141 *U.S.* 47, 58, 11 *S.Ct.* 851, 854, 35 *L.Ed.* 649, 652 (1891) (vacating criminal conviction imposed on agent of interstate corporation for failure to register before doing business in state). When

commerce by [qualification] statutes is to be judged with reference to the measures required to comply with such legislation, and not to the sanctions imposed for violation of it," *id.* at 42, 95 *S.Ct.* at 272, 42 *L.Ed.*2d at 211.

the Court first struck down a statute with a door-closing sanction in *International Text-Book Co. v. Pigg, supra,* 217 *U.S.* 91, 30 *S.Ct.* 481, 54 *L.Ed.* 678, it was reacting not to the sanction but to the illegitimacy of the underlying regulation, and simply applied the previously established rule forbidding such attempts at licensing foreign corporations. *See id.* at 108–10, 30 *S.Ct.* at 485–86, 54 *L.Ed.* at 686–87 (relying on *Crutcher v. Kentucky, supra*); *Buck Stove & Range Co. v. Vickers, supra,* 226 *U.S.* at 215, 33 *S.Ct.* at 43, 57 *L.Ed.* at 192 (*Pigg* did not "announce[ ] any new doctrine ..., it but reiterated and applied principles which were already well recognized").

This view of the forced-licensure cases was advanced by the majority opinion of this Court in *Coons v. American Honda Motor Co., supra,* 94 *N.J.* 307. In *Coons* this Court invalidated a provision tolling the statute of limitations in actions against foreign corporations engaged solely in interstate commerce that had not obtained a certificate to do business in New Jersey. We quite properly declined to attach talismanic significance to the door-closing sanction involved in the *Pigg* line of cases. Those cases, we said, "focused on the importance of leaving interstate commerce unfettered. As applied to this case that principle gives rise to the question whether the denial of the statute of limitations defense to unlicensed foreign corporations *impermissibly*—even though indirectly—forces those corporations to obtain a license to do business in the state." *Id.* at 318 (emphasis added). It was this impermissible regulatory objective, not the sanction, that triggered the condemnation of the dormant commerce clause. "The legislature cannot accomplish indirectly that which it could not do directly...." *Id.*

That the Supreme Court does not view application of a door-closing sanction against a foreign corporation to be a *per se* burden on interstate commerce is made clear by its decisions in *Eli-Lilly & Co. v. Sav-On-Drugs, Inc.,* 366 *U.S.* 276, 81 *S.Ct.* 1316, 6 *L.Ed.*2d 288 (1961), and *Union Brokerage Co. v. Jensen,* 322 *U.S.* 202, 64 *S.Ct.* 967, 88 *L.Ed.* 1227 (1944). In those

cases, the Court held that the commerce clause allows a state to deny a foreign corporation access to the state's courts for failure to comply with a qualification statute if the corporation, although also engaged in interstate commerce, does a sufficient amount of intrastate business. What made these door-closing sanctions constitutional was the propriety of the regulation itself. *See* L. Tribe, *American Constitutional Law* § 6–12, at 341 (1978) (*Eli Lilly* held that "New Jersey could properly require this multi-state drug company to obtain a certificate prior to doing local business there, and that [the company]— having failed to obtain such a certificate—could be barred from suing for breach of contract in New Jersey courts").[3]

Why is it impermissible—more specifically, why is it a violation of the commerce clause—for a state to force a foreign corporation exclusively engaged in interstate commerce to qualify to do business in the state? As previously mentioned, such qualification statutes do not necessarily discriminate in favor of the state's own corporations. The cases themselves do not provide a clear answer, but one commentator has offered a plausible explanation: the statutes condemned in *Allenberg Cotton* and its predecessors disadvantage interstate commerce "as such." That is, "a proliferation of qualification-to-do business requirements applied to firms with minimal local contacts could have the effect ... of disadvantaging interstate commerce just because such commerce straddles political boundaries." Regan, *supra*, 84 *Mich.L.Rev.* at 1189. Corporations should not, merely by virtue of engaging in interstate com-

---

[3]While the causes of action barred in *Eli Lilly* and *Jensen* did not seek to enforce an interstate contract, I do not believe the result would have been different if they had. The critical factor is the legitimacy of the regulation itself. Whereas the commerce clause prohibits states from licensing foreign corporations engaged solely in interstate commerce, "that Clause does not imply relief to those engaged in interstate or foreign commerce from the duty of paying an appropriate share for the maintenance of the various state governments." *Union Brokerage Co. v. Jensen, supra,* 322 *U.S.* at 212, 64 *S.Ct.* at 973, 88 *L.Ed.* at 1233–34. The statute challenged in this case does no more than that.

merce, give up their control over their amenability to jurisdiction in foreign states or over the disclosure of important financial information. The qualification statutes forced foreign corporations to do precisely that, and hence penalized those corporations solely because they were engaged in interstate commerce.

New Jersey's Reporting Act has no such effect. "[W]e have not here a case of [a] foreign corporation merely coming into [New Jersey] to contribute to or to conclude a unitary interstate transaction, nor of the State's withholding 'the right to sue even in a single instance until the corporation renders itself amenable to suit in all the courts of the State by whosoever chooses to sue it there.'" *Union Brokerage Co. v. Jensen, supra,* 322 *U.S.* at 211, 64 *S.Ct.* at 973, 88 *L.Ed.* at 1233 (citations omitted). While not localizing its activities in New Jersey to such an extent that it could be said to be doing business here, the typical foreign corporation subject to the Act will have voluntarily structured its activities in such a way as to be subject to taxation under CITA.[4] The Reporting Act does not disadvantage interstate commerce "as such." Unlike the qualification statutes, it does not "accomplish indirectly that which it could not do directly;" its regulatory objective is totally permissible. Accordingly, the *per se* rule of invalidity created in the forced-licensure cases does not apply. The fact

---

[4]Or, at the least, the foreign corporation will have derived sufficient revenues from New Jersey so as to be subject to the reporting requirement, even if its contacts fall short of the constitutional minimum necessary to justify an exercise of the state's taxing power. This may be the case with plaintiff here. *See Chemical Realty Corp. v. Taxation Div. Director,* 5 *N.J. Tax* 581, 605–16 (1983). The issue has not been briefed or argued, however, and so we have no way of knowing its proper resolution. The analysis set forth in this opinion proceeds on the assumption that plaintiff is the typical foreign corporation, *i.e.,* one whose connection with New Jersey is sufficient to justify the imposition of the CITA tax. But even if plaintiff were not subject to taxation, this would not necessarily mean that it would also be constitutionally immune from application of the reporting requirement, which imposes a lesser burden and hence arguably may be triggered by a lesser quantum of forum contacts. This issue, too, is not before us.

that the sanction the Act applies for a violation of its regulation may have the effect of rendering unenforceable a contract made in interstate commerce is not salient.

## II.

In the portion of its opinion declaring the inapplicability of the *per se* rule, the plurality acknowledges that without the Reporting Act, the Director "would find it almost impossible" to determine which corporations were subject to CITA; that compliance with CITA would become largely voluntary; and that such a result "would deprive the state of revenue, be unfair to those corporations that comply voluntarily, and give an unfair advantage to these corporations that avoid the tax." *Ante* at 288.

Yet it is precisely this calamitous state of affairs that the plurality has brought on as a result of its application of the balancing test. The plurality's "modification" of the Reporting Act—allowing a corporation to proceed with its cause of action so long as it files an Activities Report and satisfies the conditions of *N.J.S.A.* 14A:13–20c(2), regardless of whether the Report was filed in the same accounting period as the cause of action—means that for the vast majority of foreign corporations, compliance with the Reporting Act, and hence with CITA (violations of which, according to the plurality, are "almost impossible" to discover without the Reporting Act), will be voluntary. I cannot agree that the commerce clause mandates such an absurdity.

The plurality advances two reasons in support of its conclusion that the state interest in assuring compliance with the Reporting Act is insufficient to justify the burden placed on interstate commerce by the door-closing sanction. First, "the penalty (the value of the lost cause of action) may be completely disproportionate to any tax that might be due"; second, "the statute gives a windfall to defendants that they can exploit for

their own economic advantage."[5]    Ante at 289–290.   Neither of these arguments comes close to establishing a constitutional defect.

The claim that "the penalty ... may be disproportionate to any tax that might be due" is unconvincing for several reasons. First, this claim mistakenly assumes that what is being penalized is the failure to pay tax.   That is not true; what is being penalized is the failure to comply with the statute, *i.e.*, to file a Business Activities Report.   Thus, each violator has committed precisely the same offense, and it is erroneous for the plurality to assume that the amount of unpaid taxes should influence the question of "proportionality."

This is not to deny that there is still a measure of disproportionality caused by the fact that the values of causes of action vary.   The plurality neglects to point out, however, that the Act *does* make one important attempt to fit the penalty to the offense.   The Act excuses noncompliance at the time of suit if the foreign corporation subsequently complies and if the initial failure to file "was done in ignorance of the requirement to file, [and] such ignorance was reasonable in all circumstances." *N.J.S.A.* 14A:13–20c.   In effect, therefore, the Act's "stiff sanction" applies only to what could be called "willful" violators, *i.e.*, those who had knowledge of the filing requirement. Non-willful violators are given the opportunity to avoid the sanction.

The only substantive change effected by the plurality's rewriting of the Act's enforcement mechanism, therefore, is to give willful violators the same opportunity as non-willful violators to avoid the sanction.   The plurality does not say the sanction cannot be used at all;   it permits the sanction to be

---

[5]The plurality also criticizes the sanction for applying without regard to whether a foreign corporation is actually liable for any tax.   The point is a negligible one.   As the plurality itself notes, "the reporting requirement is carefully limited to those corporations that satisfy any of the conditions cited in *N.J.S.A.* 14A:13–15, and are therefore likely to owe a tax." *Ante* at 287.

used where a foreign corporation continues to fail to file an Activities Report and pay its taxes even after filing suit. Presumably a foreign corporation would adopt this course of action (continuing to fail to comply) where the cost of compliance (paying taxes) exceeded the value of the lost cause of action; indeed it would choose not to file the suit at all, lest the New Jersey authorities discover its existence. This strategizing will indeed lead to a greater measure of "proportionality" between the amount of the penalty and the amount of the cause of action, but it is difficult to see how the plurality's scheme is any more fundamentally fair, much less constitutionally required. Indeed, the plurality's change creates its own unfairness, stemming from the fact that it has left intact the Act's "requirement" but effectively eliminated any sanction for noncompliance. This will mean that only those foreign corporations that happen to have a need to use the New Jersey courts (or that have an uncharacteristic commitment to the rule of law) will end up supplying the Activities Report and paying taxes. It is hardly fair that compliance with the Act should turn on such a fortuity.[6]

The plurality's second criticism of the door-closing sanction—that it bestows a "windfall" on undeserving defendants—is even less persuasive. In numerous contexts, the law permits private litigants to come away with a "windfall" if doing so is the only or the most effective way of assuring that an important public interest is served. Statutes and common-law rules permitting plaintiffs to collect treble or punitive damages

---

[6]The plurality finds its enforcement scheme analogous to that contained in the Act as written, under which a corporation could similarly calculate that the cost of compliance exceeded the value of its anticipated causes of action in New Jersey. *Ante* at 291 n. 10. This substitutes analogy for analysis. The real question, of course, is the *probability* of compliance. The answer to that question is that it is exceedingly more probable that a foreign corporation would choose to comply if forced to make its decision in advance of the accrual of its causes of action—when it cannot be sure of the likelihood or magnitude of its potential loss—than if allowed to postpone making its decision until after an actual cause of action has arisen.

against malefactors, particularly corporate malefactors, who would otherwise likely go unpunished by the criminal justice system, are prime examples. Defendants who claim that a plaintiff-foreign corporation has failed to file an Activities Report perform exactly the same function.

But more fundamentally, the plurality's insistence on proportionality and concern with windfalls seem decidedly misplaced in this context. The plurality opinion fails to consider the practical fact that undoubtedly drove the Legislature to adopt the unusual and admittedly inexact remedy of denying access to court: the absence of any effective alternative remedies. The principal alternative, fines, is likely to have little deterrent value. The genius of the door-closing sanction is that it allows the State to rely on the threat of private litigants raising noncompliance as a defense to induce foreign corporations to comply, eliminating the need for expensive enforcement machinery designed to detect violations. Moreover, a foreign corporation engaged solely in interstate business by definition has no office, bank accounts or other assets in the forum state readily subject to attachment. This means that New Jersey authorities seeking to collect a judgment against a recalcitrant foreign corporation will have to undergo the expense of instituting legal proceedings in foreign jurisdictions.

The plurality's substitute remedy, of course, does not even include a provision for fines. The plurality's assertion that under its remedy "the state's interest in enforcing the Reporting Act is adequately served," *ante* at 290, simply flies in the face of reality. In support of its approach, the plurality opinion quotes a law review note as stating that "this approach is not as effective as a permanent retroactive bar to the courts but is 'preferred because it provides effective enforcement and yet is fair to the corporation.'" *Ante* at 292 (quoting Note, "Sanctions for Failure to Comply with Corporation Qualification Statutes: An Evaluation," 63 *Colum.L.Rev.* 117, 130 (1963)). That Note, however, goes on to recognize what the plurality does not, namely, that such an approach is incomplete unless

"[t]he need for deterrence" is "met by a companion provision imposing monetary penalties." 63 *Colum.L.Rev.* at 130. The Act does not have such a companion penalty provision, and it is clear that the author of the Note thought such a provision indispensable to effective deterrence. In fact, the Note strongly criticizes statutory schemes embracing the plurality's approach. "[T]hose statutes requiring payment only of past fees and taxes accruing while the corporation has illegally done business ... lack sufficient deterrent value to be effective. Clearly, the benefits inuring to the corporation that has not qualified would encourage the continued illegal transaction of business until the violation is discovered." *Id.* at 122.[7]

Under the Supreme Court's commerce clause balancing test, one important consideration is "whether alternative means could promote [the] local purpose as well without discriminating against interstate commerce." *Hughes v. Oklahoma,* 441 *U.S.* 322, 336, 99 *S.Ct.* 1727, 1736, 60 *L.Ed.*2d 250, 262 (1979). The plurality has failed to take this consideration into account here. It is reasonably clear that no alternative means besides the door-closing sanction could as well serve the state interest in assuring compliance with the Reporting Act.

Finally, the plurality gives insufficient consideration to the important state interest advanced by the Reporting Act and the door-closing sanction: assuring that foreign corporations pay their fair share of taxes for income they derive from New Jersey residents. "[T]axes are the lifeblood of government, the vital force needed to sustain the public interest." *City of Philadelphia v. Austin,* 86 *N.J.* 55, 65 (1981). "When one

---

[7]Even if the Act did have a provision for fines, reliance on the Columbia Note for the proposition that fines could meet the need for deterrence would be misplaced. The Note deals with statutes requiring qualification as a condition for "doing business" within a state (*i.e.,* conducting intrastate business). The statute at issue in this case deals with corporations engaged solely in interstate commerce. As previously noted, such corporations, unlike foreign corporations doing business within a state, will not have assets within the state and therefore will not be as effectively deterred by the prospect of fines.

taxpayer fails to bear his or her fair share, the burden becomes heavier on other taxpayers." *Id.* This will certainly be one result of the rampant tax evasion unleashed by the Court's decision today. Yet the plurality reaches its conclusion that the sanction is unconstitutional without even mentioning this basic state interest.

In sum, the plurality's balancing analysis is unbalanced. It greatly exaggerates the "unfairness" of the "burden" imposed by the door-closing sanction on interstate commerce; ignores the unavailability of effective alternative sanctions; and neglects the undeniable importance of the state's interest in assuring that each taxpayer pays its fair share of taxes. In my view the plurality's crippling of the Reporting Act amounts to a needless overturning of a perfectly reasonable, and perfectly constitutional, legislative judgment.

### III.

In a recent opinion, Justice Scalia warned of the hazards inherent in the judicial enterprise of determining, under the dormant commerce clause balancing test, whether a statute's local benefits are "outweighed" by its impact on interstate commerce. *See CTS Corp. v. Dynamics Corp.,* —— *U.S.* ——, ——, 107 *S.Ct.* 1637, 1652, 95 *L.Ed.*2d 67, 89 (1987) (Scalia, J., concurring). "[S]uch an inquiry," Justice Scalia wrote, "is ill suited to the judicial function and should be undertaken rarely if at all." *Id.* Today's decision provides sobering confirmation of Justice Scalia's thesis. Although I am not prepared to agree that balancing lacks any appropriate role in commerce clause adjudication, it is clear to me that, if and when done, balancing should be performed with far more care and with far more sensitivity to the Legislature's policy determinations than the plurality has exhibited here. "[A] court should not [invalidate state legislation under the dormant commerce clause] merely because it believes it to be in the public interest to determine policy where Congress has not." *Continental Trailways, Inc.*

*v. Director, Div. of Motor Vehicles,* 102 *N.J.* 526, 553 (1986) (O'Hern, J., dissenting). Because the plurality appears to have done just that in this case, producing a remedy that is no remedy at all, I respectfully dissent.

HANDLER, J., dissenting.

First Family Mortgage Corporation of Florida (First Family) is a Florida corporation whose principal place of business is in Illinois. First Family has no offices, employees, salespersons, or representatives in New Jersey. It has neither received a certificate of authority to transact business in the State, *N.J. S.A.* 14A:13–3, nor filed a notice of business activities within the State, *N.J.S.A.* 14A:13–15.

First Family invests in and services FHA and VA guaranteed mortgages and acts as a servicing custodian for the Government National Mortgage Association (GNMA) loans, 24 *C.F.R.* § 390. It does not originate loans in the state, but it does acquire in the secondary mortgage market[1] loans secured by New Jersey real estate. The mortgage loan in this case was made by Provident Mortgage Corporation to Linda Durham for a house in Camden County. The loan was VA guaranteed and part of a GNMA grouping[2] of 68 loans that were sold through Mid States Mortgage and Service Company, an Illinois corporation, to First Family.

In January 1983, Durham defaulted on her mortgage. In July 1983, First Family moved in the Camden County Superior Court, Chancery Division, to foreclose. In May 1985, the trial court dismissed First Family's complaint because of First Family's failure to file a notice of business activities within the state.

---

[1] The secondary market involves transfers of loans to permanent investors, which may then be combined into GNMA mortgagee-backed securities to be sold in shares to customers.

[2] *See* note 1.

The Corporate Business Activities Reporting Act (Act or Reporting Act), *N.J.S.A.* 14A:13–14 to –23, requires foreign corporations not authorized to do business in the state, but which have any of seven listed connections with the state, to file a notice of business activities report. The Act applied to First Family because it received payments totaling over $25,000 from persons residing in the state. *N.J.S.A.* 14A:13–15(e). These payments came in the form of payments on federally guaranteed home mortgages First Family acquired in the secondary mortgage market. Failure to comply with the Reporting Act disables the violating corporation from using state courts to enforce its contracts. *N.J.S.A.* 14A:13–20(b).

> The Corporation Business Activities Reporting Act is essentially an information gathering measure. Its clear purpose is to enable the Division of Taxation to obtain pertinent data from any foreign corporation which carries on an activity in the State but which has not obtained a certificate of authority to do business in New Jersey, to the end that a proper determination may be made as to whether such corporation is subject to any State tax. [*Associates Consumer Discount Co. v. Bozzarello*, 149 *N.J.Super.* 358, 362 (App.Div.1977).]

"This Notice requirement, coupled with appropriate sanctions, is designed to strengthen the enforcement of the State's corporation tax laws." 5 *Report of the New Jersey Tax Policy Committee* 34 (1972).

First Family admits the applicability to it of the Reporting Act but challenges the Act's constitutionality under the negative implications of the commerce clause of the federal constitution (the "dormant commerce clause"), U.S. Const. art. I, § 8.[3] The trial court expressed doubts as the constitutionality of the Act, but felt compelled by an earlier Appellate Division decision, *Associates Consumer Discount Co. v. Bozzarello, supra,* 149 *N.J.Super.* 358, to uphold the validity of the Act. The

---

[3]First Family also challenged the Act under the supremacy clause of the federal constitution, arguing that the Act is in conflict with the National Housing Act. The claim was rejected by the trial court and by the Appellate Division. *First Family Mortg. Corp. of Florida v. Durham,* 205 *N.J.Super.* 251, 255 (App.Div.1985). Because of how I would decide the commerce clause claim, I would not reach First Family's supremacy clause claim.

Appellate Division upheld the dismissal. *First Family Mortg. Corp. of Florida v. Durham*, 205 *N.J.Super.* 251 (App.Div. 1985). It rejected the commerce clause challenge, noting that the reporting requirement, unlike a licensing requirement, does "not require a foreign corporation engaged solely in interstate commerce to consent to being sued in that state as the price of doing business there." *Id.* at 255.

The plurality agrees with the Appellate Division that the Reporting Act, at least as modified, does not violate the commerce clause. The plurality reasons that since the reporting requirement is a minimal and reasonable requirement, it cannot be characterized as an unconstitutional burden on interstate commerce. The plurality's mistake is that it emphasizes the nature and severity of the Act's requirement rather than the nature and severity of the Act's sanctions. Its approach is contrary to the approach mandated by the United States Supreme Court in similar cases. In its elaboration of the dormant commerce clause, the Supreme Court has developed the following doctrines: that 1) the ability to use state courts to enforce interstate transactions is an integral part of interstate commerce and, therefore, 2) states cannot close access to their courts to corporations acting solely within interstate commerce.

In *Sioux Remedy Co. v. Cope*, 235 *U.S.* 197, 35 *S.Ct.* 57, 59 *L.Ed.* 193 (1914), the Supreme Court invalidated under the commerce clause a South Dakota statute that closed its state courts to foreign corporations that did not file a copy of their charter, appoint an agent for service of process, and pay a filing fee. The Court first noted "that the right to demand and enforce payment for goods sold in interstate commerce, if not a part of such commerce, is so directly connected with it and is so essential to its existence and continuance that the imposition of unreasonable conditions upon this right must necessarily operate as a restraint or burden upon interstate commerce." *Id.* at 202–03, 35 *S.Ct.* at 59, 59 *L.Ed.* at 197. The Court found the conditions to be unreasonable because they had no relation to

the costs or procedures of a court trial.[4]  *Id.* at 204–05, 35 *S.Ct.* at 60, 59 *L.Ed.* at 198.

In *Dahnke-Walker Milling Co. v. Bondurant,* 257 *U.S.* 282, 42 *S.Ct.* 106, 66 *L.Ed.* 239 (1921), the Supreme Court invalidated under the commerce clause an application of a Kentucky statute to a contract-enforcement suit brought by a foreign corporation.  The corporation had sought to enforce a transaction that was completely within interstate commerce.[5]  Kentucky's statute prescribed the conditions on which foreign corporations could do business in the state.  Because the corporation had not complied with the statute, verdict was directed against it on its suit.

The Court concluded:  "A corporation of one state may go into another, without obtaining the leave or license of the latter, for all the legitimate purposes of such commerce;  and any statute of the latter state which obstructs or lays a burden on the exercise of this privilege is void under the commerce clause."  *Id.* at 291, 42 *S.Ct.* at 109, 66 *L.Ed.* at 244.

In *Allenberg Cotton Co., Inc. v. Pittman,* 419 *U.S.* 20, 95 *S.Ct.* 260, 42 *L.Ed.* 2d 195 (1974), the Supreme Court invalidated an application of a Mississippi statute that required foreign

---

[4]The Court found the conditions to be unreasonable also because they would subject the foreign corporations to suit in the enforcing state.  *Sioux Remedy, supra,* 235 *U.S.* at 205, 35 *S.Ct.* at 60, 59 *L.Ed.* at 198.  The Appellate Division put great emphasis on the fact that the Reporting Act does not subject foreign corporations to suit within the state.  *First Family Mortg., supra,* 205 *N.J.Super.* at 255.  However, the more recent United States Supreme Court rulings invalidating court-closing statutes, discussed below, did not rely on whether the statutes did or did not subject the foreign corporations to suit within the enforcing state.

[5]Because this case involves an appeal from a summary judgment, we must accept First Family's assertion that it is not engaged in intrastate business activities within the state.

A state has substantially greater discretion in its treatment of foreign corporations if the corporations' activities are localized or intrastate.  *See Eli Lilly & Co. v. Sav-On-Drugs, Inc.,* 366 *U.S.* 276, 81 *S.Ct.* 1316, 6 *L.Ed.*2d 288 (1961); *Union Brokerage Co. v. Jensen,* 322 *U.S.* 202, 64 *S.Ct.* 967, 88 *L.Ed.* 1227 (1944).

corporations to obtain a certificate of authority to qualify to do business in the state. Because of a corporation's failure to comply with the statute, the trial court entered judgment for the defendant in the corporation's suit to enforce a transaction that was part of interstate commerce. The Court held "only that Mississippi's refusal to honor and enforce contracts made for interstate or foreign commerce is repugnant to the Commerce Clause." *Id.* at 34, 95 *S.Ct.* at 267, 42 *L.Ed.* 2d at 206. The Court's opinion made no reference to the cost of the certification requirement or to whether the requirement would subject the foreign corporation to suit within the state.

The plurality's position in today's case was explicitly rejected by the Supreme Court in *Allenberg Cotton.* The position that "the burden imposed on interstate commerce by such statutes is to be judged with reference to the measures required to comply with such legislation, and not the sanctions imposed for violation of it", gained the support of only the one dissenting Justice. *Allenberg Cotton,* 419 *U.S.* at 42, 95 *S.Ct.* at 272, 42 *L.Ed.*2d at 211 (Rehnquist, J., dissenting).

*Allenberg Cotton* and *Sioux Remedy* have been characterized as cases whose decisions were based on the states involved having barred foreign corporations from their state courts. *Coons v. Honda Motor Co.,* 469 *U.S.* 1123, 1124, 105 *S.Ct.* 808, 808, 83 *L.Ed.* 2d 800, 801 (1985) (Rehnquist, J., dissenting from the denial of certiorari). Justice Rehnquist noted that when states bar access to state courts, "out-of-state corporations which entered into contracts in-state [have] no forum in which to enforce these contracts, and out-of-state competition [is] effectively precluded." 469 *U.S.* at 1125, 105 *S.Ct.* at 809, 83 *L.Ed.* 2d at 802.

The plurality in this case argues that the Reporting Act should be upheld because it merely facilitates the assessment and collection of taxes. However, this characterization could also be applied to the foreign corporation statutes struck down in the Supreme Court cases discussed earlier. *See Allenberg*

*Cotton, supra,* 419 *U.S.* at 40 n. 6, 95 *S.Ct.* at 271 n. 6, 42 *L.Ed.* 2d at 210 n. 6 (Rehnquist, J., dissenting).

The plurality ignores the doctrine of unconstitutional conditions in asserting that because the reporting requirement is reasonable, it can be enforced even with the most severe of sanctions. "[I]t may be conceded that a state may restrict the right of [foreign] corporations to engage in business within its limits. But the power so to deal with these subjects, like all other state powers, can only be exerted within the limitations which the Constitution of the United States places upon state actions." *Sioux Remedy,* 235 *U.S.* at 203, 35 *S.Ct.* at 59–60, 59 *L.Ed.* at 197 (citations omitted). The states are simply without power to put an undue burden on interstate commerce even to support an otherwise valid state objective. *Cf. Philadelphia v. New Jersey,* 437 *U.S.* 617, 626, 98 *S.Ct.* 2531, 2536, 57 *L.Ed.* 2d 475, 483 (1978) ("the evil of protectionism can reside in legislative means as well as legislative ends").[6] Barring access to state courts is such an "undue burden."

The plurality's "judicial surgery" alters the Act to allow corporations who have not complied with the reporting requirement to sue in the state courts if it first files the delinquent required reports. *Ante* at 288–293. Admittedly this alteration makes the Act a less onerous burden on interstate commerce. However, this alteration does not make the Act constitutional. As altered, the Act still allows the State to bar access to its courts if the corporation does not file a report. This allowance cannot be given under the commerce clause. I believe the relevant Supreme Court decisions must be read to preclude states from either absolutely or conditionally closing their courts to corporations that are doing business only in interstate commerce.

---

[6]Nor can it be argued that barring access to the state courts is the only means of enforcing the reporting requirement. *See* Note, "Sanctions For Failure To Comply With Corporate Qualification Statutes: An Evaluation", 63 *Colum.L.Rev.* 117 (1963).

314

The application of the Corporate Business Activities Reporting Act to bar access to foreign corporations to state courts, when this refusal of access prevents enforcement of transactions within interstate commerce, is unconstitutional under the commerce clause of the federal constitution. For that reason, I would reverse the decision of the Appellate Division in this case.

*For modification and affirmance*—Justices POLLOCK, GARIBALDI and STEIN—3.

*Opposed*—Justices CLIFFORD and HANDLER—2.